**In re GIBSON & CUSHMAN DREDGING CORP., Debtor.**

**Bankruptcy No. 088–0147–21.**

United States Bankruptcy Court, E.D. New York.

Aug. 2, 1989.

---

Harvis & Zeichner by Abraham Backenroth, New York City, for debtor.

Philip R. Mann, New York City, for creditors committee.

Shea & Gould, by Brian Kriger, New York City, for Christopher Kirk.

Robert P. Herzog, New York City, for Creditors Milam and DiIorio.

U.S. Trustee for E.D.N.Y. by Christine Black, Garden City.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

Before the Court is a motion by the debtor and debtor-in-possession, Gibson & Cushman Dredging Corp. ("Gibson & Cushman"), requesting that it be allowed to enter into an employment contract with Christopher C. Kirk ("Kirk"). He is now the debtor's Chief Operating Officer, under the contract he would also fill the position of President.

The motion was heard on July 25, 1989. Gibson & Cushman submitted evidence in support of its motion; the Creditors' Committee, in opposition. Philip Mann, Esq., the attorney for the Creditors' Committee and Robert Herzog, Esq., the attorney for two of the three creditors that constitute the Creditors' Committee, also spoke in opposition. The United States Trustee supported the debtor's motion.

As this Court has observed in previous opinions, with which familiarity will be assumed, this is far from being a garden variety Chapter 11. Until Joseph DiIorio, a seaman, recovered a $2.5 million judgment against Gibson & Cushman in the Supreme Court of New York on January 13, 1988, Gibson & Cushman was a solvent company, earning a steady profit and well able to meet its debts as they matured. It resorted to Chapter 11 to avoid being forced into liquidation while it pursued its appeal in the New York courts, with which it has been partially successful in that the Appellate Division has ordered a new trial on damages unless DiIorio consents to a reduction of $750,000 in the amount awarded him.

Two other major creditors in litigation with the debtor have surfaced in this Chapter 11 proceeding who, together with DiIorio, form the Creditors Committee. One is a deceased seaman, Andrew J. Milam, whose tort claim is now held by the Public Administrator of the County of New York, represented by Joseph Heller, who is also DiIorio's attorney. Milam's claim for $500,000 is based upon torts committed by a company claimed to be a predecessor of Gibson & Cushman, to whose assets Gibson & Cushman allegedly succeeded under circumstances making it responsible for the other company's liabilities. The third claimant is Malvin Gamborg who, up to 1985, was the President and Chief Executive Officer of Gibson & Cushman and who claims $600,000 to be owing him for unpaid bonus and salary during his employment. Even with the DiIorio claim as reduced by the Appellate Division, the three claims total, with interest, in the neighborhood of $3 million.

Since Gibson & Cushman filed in Chapter 11 it has accumulated a large amount of cash due primarily to the fact that it is no longer turning its profits over to a related company as compensation for administrative and supervisory services. Gibson & Cushman is but one of a number of companies organized by Kenneth Carroad, now deceased, a tax attorney. For reasons which are unclear to the Court, but which are in any event not material to the present motion, Gibson & Cushman entered into an agreement in 1971 which obligated it to turn over all its income in excess of a stipulated amount to a related corporation also controlled by Kenneth Carroad, in pay-

ment of supervisory services. With this agreement suspended, Gibson & Cushman has accumulated $1.7 million in cash. Of this sum, $500,000 is committed to backing up the guarantees made by its bonding companies which guarantees are a prerequisite to governmental contracts which form the bulk of Gibson & Cushman's business. Another $300,000 has been escrowed to protect DiIorio's judgment. This leaves the company about $900,000 for working capital; it requires at least $500,000 for this purpose.

Christopher Kirk first became associated with Gibson & Cushman 14 years ago and has steadily risen in influence and responsibility within the company until at the time it filed under Chapter 11 he was its Chief Executive Officer and Vice President responsible for all aspects of the company's business. For many years he worked pursuant to a contract which entitled him, in addition to his base salary, to a bonus predicated on the profits of Gibson & Cushman before payment of supervisory expenses to the related corporation. It is not clear and it is not important for our present purposes whether the bonus was paid by Gibson & Cushman in its entirety or by related corporations in whole or in part.

The bonus ceased being paid when Kirk entered into a contract—the existence of which is disputed by the Creditors Committee—to purchase Gibson & Cushman for $3 million. This contract has just been rejected by Gibson & Cushman. Kirk earlier filed a $3 million claim against the debtor for its failure to perform this contract and intends to file a second claim based on its rejection.

Sometime prior to the DiIorio judgment Kenneth Carroad died and his heirs, it is said, are now disputing with one another about their inheritance. Jeffrey Carroad, who is a son of Kenneth Carroad, has succeeded to the control of Gibson & Cushman and is its President and is said to be the owner of its stock. However, the actual operation of the company appears to be currently the responsibility of Kirk and it is under his aegis that the company has enjoyed the very substantial profits it has made even while laboring under the handicap of being in Chapter 11. Understandably, now that Kirk's contract to purchase the company has been rejected, he wishes to have his employment regularized and some assurance given with respect to his future. He and the owners of Gibson & Cushman, therefore, have entered into the contract of which they now ask the approval of the Court.

In pertinent part, the contract in question is a four year employment contract, commencing January 1, 1990, providing Kirk with a base salary of $125,000, bonuses calculated at the rate of 20% on the pre-tax income of the company, and a one time signing bonus of $150,000 in consideration of Kirk obligating himself not to compete with the debtor for a period of time after termination. The first bonus based on the formula of the 20% pre-tax income is to be applied retroactively covering the period from the time the petition was filed on February 26, 1988 through April 30, 1989. Such bonus would amount to approximately $180,000. This bonus is to be paid "as soon as practicable following the calculation thereof." The contract also provides that if the company, or substantially all of its assets, are sold prior to December 31, 1992, the term of this contract, Kirk's term of employment would terminate upon 90 days notice.

Kirk has testified, and the Court credits his testimony, that except for the cash payments the terms of the contract are in essence those under which he has been working during the entire Chapter 11 period. The bonus arrangement, except for the up-front, one-time payment for the commitment not to compete appears to do no more than carry forward the pre-petition arrangement. The terms of the contract bear all the evidence of a hard fought arm's-length negotiation spelling out in detail exactly how the income is to be calculated on which Kirk's bonus will depend in future.

The United States Trustee said that she considered entry into the contract to be a matter of business judgment, that there were good business reasons for it; that the

debtor was making a profit; that Mr. Kirk had shown he was extremely valuable to the company in the positions he had held; that it seemed the company was profitable because of the time and energy of Mr. Kirk alone; and that substituting somebody for Mr. Kirk might not work at all to the company's benefit.

The Creditors' Committee objected to the proposed contract on essentially two grounds. First they maintained that Kirk could easily be replaced at far less cost. Second, they objected to the invasion of the company's cash at the present time in the amount proposed because it would leave the company with insufficient capital for its operations.

Little time need be spent on the contention that Kirk can be replaced at half the contract wage. The man called by the Creditors' Committee as an expert to establish this fact turned out to have no knowledge whatever of current wage rates and personnel demands in the North Atlantic trade, his experience being largely confined to the South. At the request of the Creditors Committee he had located an engineer, 36 years of age, willing to work in New York for $60,000. Kirk, however, is far more than an engineer, he is the chief executive of this company familiar with its operations for over 14 years, knowledgeable about its resources, its limitations, the demand for its services, familiar with its personnel. His value is demonstrated by the very profitable operations of the company in the year and a half it has been in this court. At least one other company in the same business as Gibson & Cushman has made him an offer comparing favorably with the contract now before the Court, confirming the value of his services.

The Creditors' Committee second objection, however, gives the Court more pause. Gibson & Cushman is not a large company; $330,000 represents a substantial fraction of its cash and of its total assets. It would reduce its working capital to close to the bare minimum. Furthermore, it would substantially reduce assets which even without reduction may be insufficient to satisfy the claims of its major creditors: DiIorio, Milam and Gamborg.

This Court has repeatedly extended the debtor's exclusive time to file a Chapter 11 plan denying the creditors the right to liquidate the company through a liquidation plan. Were they to be allowed to do so they would be able to recover whatever the claims they are now making against Gibson & Cushman, plus interest, plus attorney's fees because even if the resources of Gibson & Cushman itself proved inadequate, they will probably be able to recover their money from the related companies to which past income of Gibson & Cushman was channeled.

Because the Court wanted to preserve Gibson & Cushman as an economic unit for the benefit of the community of which it is a part, for the benefit of its employees and for its executives, like Kirk, who have devoted their life to it, and because it was confident that given time to sort out its claims, Gibson & Cushman, in view of its earnings record, would be able to propose a plan that would satisfy all its creditors and meet the requirements of the Code, it held up the liquidation threatened by the creditors. However, the reduction in DiIorio's claim and the buildup of capital indicate that Gibson & Cushman should now be able to file a plan, particularly since the claims of Gamborg and Milam should be resolved sometime in the near future. At the hearing on the contract, counsel for Gibson & Cushman in fact stated that it is Gibson & Cushman's intention to file a plan no later than September 11, 1989.

In *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir.1983), the Court of Appeals emphasized the importance of giving parties affected by a Chapter 11 proceeding the benefit of the protections accorded to them in connection with confirmation of a Chapter 11 plan. Although that case did not involve approval of a contract of employment but rather a contract for the sale of a significant asset, the cautions expressed there are appropriate here. In terms of the financial situation of this company the proposed contract involves a very significant immediate outlay and a measurable reduction of its

liquid assets. It should not be entered into outside of a plan of reorganization, particularly with the filing of a plan so close.

The Court sees no objection to Gibson & Cushman committing itself in a plan of reorganization to the employment of Kirk on the terms contained in the contract should its owners succeed in reorganizing the company.

The situation, of course, will be different if it is the creditors who confirm a plan. At the hearing, the Court expressed its concern with the fact that although there appeared to be a 90 day termination of the contract available upon liquidation of all, or substantially all, of the assets of the company, there was no provision for termination if the creditors proposed a plan which won confirmation. The Court's concern was that the creditors would be bound for four years to a contract they did not want. After discussion among the debtor, the attorney for Kirk and Mr. Kirk, it was agreed that the contract would be modified so that in the event of a plan proposed by the creditors being approved rather than one proposed by Gibson & Cushman, Gibson & Cushman would not be bound by this contract. In return, Mr. Kirk requested that in that event the non-competing clause not apply. All parties agreed to this change and suitable language to this end has been sent the Court.

Although this change meets one of the Court's concerns, the Court continues to have difficulty with the reduction of the company's capital by $330,000 outside of a plan of reorganization. The Court recognizes that there is a grave possibility that if the contract is not approved as written and Kirk does not receive this sum right now he may elect to take one of the other offers available to him. The Court also has little doubt that his departure would mean the demise of the company and its liquidation, exposing the other Carroad companies potentially to the multi-million dollar claims of DiIorio, Milam and Gamborg. But from the little the Court knows of the other Carroad companies, the debtor's shareholders have the resources to meet Kirk's requirements without invading the limited capital of Gibson & Cushman should they care to do so. If they elect otherwise, if they do not see it in their interest to keep this company alive, they cannot be heard to complain if its creditors insist on its liquidation in order to ensure the payment of their claims.

For the foregoing reasons the Court will not approve entry into the proposed contract as written at the present time. It will approve all aspects of the contract apart from the cash payments called for on its signing, totalling $330,000. This denial is without prejudice, as the Court has tried to make clear, to the incorporation of all the terms of the contract, including the cash payments, into a plan of reorganization.

Settle Order.