**In re The LESLIE FAY COMPANIES, INC., et al., Debtors.**

**Bankruptcy No. 93 B 41724 (TLB).**

United States Bankruptcy Court,
S.D. New York.

April 15, 1997.

As Corrected April 21, 1997.

Weil Gotshal & Manges, L.L.P. by Alan B. Miller, Brian S. Rosen, Frank L. Eaton, and Larren M. Nashelsky, New York City, for Debtors.

Wachtell, Lipton, Rosen & Katz by Richard G. Mason, New York City, for Official Committee of Unsecured Creditors.

Wisehart & Koch, by Arthur M. Wisehart, Heather R. Boshak, New York City, for Claimants.

Lowenthal Landau Fischer & Bring, P.C. by Matthew J. Gold, New York City, for CIT.

Togut, Segal & Segal, by John A. Porges, New York City, for 1400 Broadway.

Zivyak Klein & Liss, by Jeffrey L. Zivyak, Gilbert, Segall and Young L.L.P. by Martin P. Miner, New York City, for 1412 Broadway Associates.

McDermott, Will & Emery by Barbara R. Funt, New York City, for Debtors' Special Labor Counsel.

Robinson Silverman Pearce Aronsohn & Berman L.L.P. by Susan Power Johnston, New York City, for New York Life Insurance Co.

Lacher & Fox by Joseph L. Fox, New York City, for Stanley Wax.

Bachner, Tally, Polevoy & Misher, L.L.P. by Risa M. Rosenberg, New York City, for Arthur Levine, et al.

Eric R. Kuhn, PLR Linings & Coatings Inc., Bethlehem, PA, pro se.

## DECISION AND CONFIRMATION

TINA L. BROZMAN, Chief Judge.

The Leslie Fay Companies, Inc., a publicly held Delaware corporation, and most of its operating subsidiaries[1] (collectively "Leslie Fay") seek to confirm a joint plan of reorganization which has garnered the overwhelming support of all their creditor classes. The debtors are joined by the other proponent of their plan, the Official Committee of Unsecured Creditors (the "creditors' committee"). A handful of former employees, Jacob V.

---

1. Seven of Leslie Fay's operating subsidiaries are nondebtors.

Falbaum, Anthony E. Gill, Emile Lewkowiez, Raymond J. Terwilliger, Lee Kishbaugh and Elizabeth Michaud (collectively "the Claimants"), object to confirmation contending that the plan is not in the best interests of creditors, is not economically feasible, and was not proposed in good faith. All six of these claimants allege some form of prohibited discrimination. Five assert only prepetition discriminatory action, but all contend they are entitled to postpetition administrative damages because of the debtors' failure to rehire them. The claims assert an aggregate indebtedness of some $80 million, the bulk of which is punitive damages for willful discrimination. The claims have not yet been fully adjudicated,[2] but I have estimated two of the six at a total value of $469,687.81, not entitled to priority, and three of the six at $0.[3] The parties agreed to estimate the sixth at $100,000 with an administrative priority.

The Claimants oppose confirmation on essentially four grounds: (1) the continuation of current management; (2) the presence in the plan of section 37.6, a release provision, negotiated not by Leslie Fay but by the creditors' committee; (3) the plan's failure to capture for creditors a substantial amount of insurance proceeds which are argued to be available to the estate and (4) the plan's risk vis-à-vis $140 million worth of net operating losses ("NOLs"). Another former employee, Juan Kelly, objects to confirmation because, he says, the plan does not provide for payment of retiree benefits. Two shareholders of Leslie Fay contend the plan unfairly discriminates against equity because although all equity is to be cancelled under the plan, current shareholder/officers of Leslie Fay will receive options to purchase new shares

of the reorganized companies, some portion of which will be granted on the effective date of the plan if it is confirmed.

## I.

### A. *Background*

Leslie Fay has been in continuous operation since it was founded in 1947 by Fred Pomerantz, the father of Leslie Fay's current Chairman and Chief Executive Officer, John J. Pomerantz. Leslie Fay is engaged principally in the design, manufacture, and sale of diversified lines of moderate and better priced women's apparel, including dresses, suits, and sportswear. Its stock is listed on the New York Stock Exchange.

On February 1, 1993, Leslie Fay announced that it had discovered certain "accounting irregularities" arising from false entries that had been made in its bookkeeping system. The irregularities encompassed significant misstatements of inventory and cost of goods sold, which were more than likely intentionally caused by at least two former members of Leslie Fay's financial department, Paul Polishan and Donald Kenia. The misstatements resulted in Leslie Fay's reporting income of approximately $81 million in excess of actual results. The irregularities came to light during Leslie Fay's annual independent audit performed by BDO Seidman & Co. ("BDO Seidman") which informed Leslie Fay that it would have to restate its earnings for the years 1990, 1991, and 1992. As a result, the New York Stock Exchange suspended trading of Leslie Fay's stock.[4]

---

**2.** Three of the claimants executed releases which I have found to be valid, as a result of which the claims arising prior to the execution of the releases no longer subsist.

**3.** I held a two day estimation hearing regarding five of the six claims, the purpose of which was to estimate them for confirmation and voting purposes. The parties admitted evidence on the issue of whether the motives for the terminations were discriminatory or were part of a company-wide reduction in force as a result of the debtors' decision to close their domestic manufacturing facilities. I determined that it was probably more likely than not that three of the five Claimants were terminated and/or not rehired for rea-

sons unrelated to employment discrimination; as for the other two, I determined that the debtors' proffered reasons for termination and/or failure to rehire were the subject of sufficient dispute to accord them value for voting purposes. However, because the Claimants did not show any willful intent to discriminate, I estimated the punitive aspects of all the claims at zero. I also determined that because the alleged discriminatory conduct occurred prepetition, the estimated claims were general unsecured claims not entitled to priority.

**4.** More recently, the stock has been traded in the "pink sheets."

### B. The Court Proceedings

The discovery of the accounting irregularities spawned several litigations, not to mention the bankruptcy cases. Shareholders initiated a class action against Leslie Fay and several members of its management and board, as well as BDO Seidman. *In re Leslie Fay Securities Litigation*, Civ. No. 92–Civ–8032 ("the class action").[5] The class action is proposed to be settled for roughly $34 million, most of which is being covered by Leslie Fay's executive liability protection policy, but approximately $8 million of which is being provided by BDO Seidman.

There is also a stockholder derivative action which was commenced before the bankruptcies and names essentially the same defendants. *Langer, derivatively on behalf of the Leslie Fay Companies, Inc. v. John J. Pomerantz, et. al.*, Case No. 104544193 ("the derivative action"). The derivative action alleges that the defendants breached fiduciary duties, failed to supervise operations and employees, engaged in self-dealing to the detriment of the corporation, and knew or should have known material facts relating to the sales and earnings of Leslie Fay which they failed to disclose.[6]

About five weeks after the derivative action was commenced, the first tranche of bankruptcy filings occurred. On April 5, 1993, the affiliated companies of Leslie Fay—Leslie Fay Companies, Inc., Hue, Inc., Spitalnick Corp., and Leslie Fay Licensing Corp.—filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On November 15, 1995, the retail factory outlet stores—Leslie Fay Retail Outlets, Inc., Leslie Fay Factory Outlet (Alabama), Inc., Leslie Fay Factory Outlet (California), Inc., Leslie Fay Factory Outlet (Iowa), Inc., and Leslie Fay Factory Outlet (Tennessee), Inc.—followed. The nine cases were procedurally consolidated. Despite the existence of nine separate debtors, Leslie Fay operated in essentially two divisions, its core businesses (called Leslie Fay) centered around the Leslie Fay and Outlander labels and its Sassco division centered around the Nipon label.

Not long after the financial irregularities were disclosed, the Securities and Exchange Commission ("SEC") and certain other regulatory authorities began investigating Leslie Fay and other persons. On October 29, 1996, Polishan was indicted on several counts of securities, bank, and wire fraud. Kenia pleaded guilty to federal charges of false reporting to the SEC.

Subsequent to the bankruptcy filings, the committee of equity security holders, suing in the name of Leslie Fay, commenced an action against BDO Seidman alleging that the accounting firm recklessly and negligently breached its duties to the debtors in connection with analyzing internal controls, performing the audits, and providing unqualified certifications of Leslie Fay's financial statements. In June 1995, this action was transferred from the bankruptcy court to the District Court for the Southern District of New York. After the equity committee disbanded, Leslie Fay abandoned this action with the concurrence of the creditors' committee by failing to respond to BDO Seidman's motion to dismiss the complaint.

### C. The Examiner

Prior to the inception of the bankruptcy cases, members of Leslie Fay's "audit committee" of the board of directors, with the assistance of their attorneys, Weil Gotshal & Manges ("Weil Gotshal"), and their accountants, Arthur Andersen LLP ("Arthur Andersen"), started and later completed an investigation into the circumstances surrounding the accounting irregularities. In late September 1993, the audit committee determined that there was insufficient evidence to believe that any current member of Leslie Fay's senior management knew of, or participated in, the perpetration of the accounting irregularities. Troubled, howev-

---

5. The class action was filed in November 1992 and consolidated with later filed class actions. On May 3, 1993, the plaintiffs filed a consolidated class action complaint and dropped Leslie Fay as a named defendant because of the bankruptcy filings.

6. Based upon Leslie Fay's by-laws and applicable Delaware law, certain of the management defendants have asserted contingent claims against Leslie Fay for indemnification.

er, by Weil Gotshal's failure to reveal that it represented targets of its investigation when it sought appointment to represent the debtors in possession in connection with these cases, the creditors' committee questioned Weil Gotshal's disinterestedness under section 327(a) of the Bankruptcy Code. This immediately cast into doubt the reliability of the audit committee's report. In response, the debtors moved for the appointment of an examiner. I granted that motion and approved the retention of Charles A. Stillman to investigate (i) Weil Gotshal's disclosure and disinterestedness and (ii) the veracity of the audit committee's report to determine whether there were any viable claims in connection with the accounting irregularities. The examiner concluded that Weil Gotshal did not disclose disabling, simultaneous representations and was not disinterested as required by the Bankruptcy Code. Notwithstanding, however, the examiner concluded that Weil Gotshal represented the audit committee in a proper fashion and that the investigation was not tainted by the disabling conflicts.

The United States Trustee, based upon the examiner's report, moved to disqualify Weil Gotshal. I sanctioned the firm $1 million dollars and disqualified it from all new litigated matters in the case. However, because I did not wish to harm Leslie Fay at a delicate time in its reorganization endeavors, I did not bar Weil Gotshal from continuing its efforts to craft a plan of reorganization. *See In re Leslie Fay Cos., Inc.,* 175 B.R. 525, 539 (Bankr.S.D.N.Y.1994).

### D. The Plan

The sum and substance of the debtors' and the creditors' committee's modified third amended and restated joint plan of reorganization ("the plan") is to substantively consolidate all nine entities and then split Leslie Fay into two companies—"Reorganized Leslie Fay" and "New Sassco"—both of which will be creditor-owned.[7] Reorganized Leslie Fay will continue its core business with its traditional labels, including the Outlander label. New Sassco will also continue its existing business in women's suits and dresses, including the Nipon trademarks. The bulk of the creditors will receive a *de minimis* distribution of cash, Reorganized Leslie Fay common stock, New Sassco common stock, and New Sassco notes. There will be only one class of stock for each reorganized entity. Existing equity will be extinguished and will not receive a distribution. 3,400,000 shares of Reorganized Leslie Fay common stock, 6,800,000 shares of New Sassco common stock, and $110,000,000 of New Sassco notes will be issued. On the effective date of the plan, the stock will be 100% owned by creditors, subject to dilution upon the exercise of options granted to management under the plan.

The plan separates the creditors into eight classes and the equity holders into nine. Priority tax claims and administrative creditors will be paid in full, although the professionals have agreed to defer some of their compensation. Class 1 are priority non-tax claims receiving payment in full. There are no secured claims in Class 2. Class 3 are the bank claims which are allowed at approximately $178 million; they are impaired and receiving stock and notes asserted to be worth 84.3% of the value of their claims. Class 4 are senior note claims allowed as of the effective date at approximately $50 million; they are impaired and receiving stock and notes asserted to be worth 84.3% of the value of their claims. Class 5 are senior subordinated note claims allowed as of the effective date at approximately $25 million; they are impaired and receiving stock only, asserted to be worth 36% of the value of their claims. Class 6 are the general unse-

7. To the extent that I refer to prior amendments and restatements of the plan, the following definitions will apply: the plan and disclosure statement filed on December 5, 1996, will be referred to as the "Amended Joint Plan" and "Disclosure Statement for Amended Joint Plan," respectively; the plan, modification to the plan, and disclosure statement filed on February 3, 1997, will be referred to as the "Second Amended Joint Plan," "Modification of Amended Joint Plan," and "Supplemental Disclosure Statement," respectively; the plan and disclosure statement filed on February 28, 1997, will be referred to either as "the plan" or the "Third Amended Joint Plan" and the "Second Supplemental Disclosure Statement," respectively. The "Modification of Third Amended Joint Plan" was filed on April 4, 1997.

cured claims estimated as of the effective date at approximately $73 million; they are impaired and receiving stock and notes asserted to be worth 79.5% of the value of their claims. Class 7 are the convenience claims, receiving payment in full. Class 8 are statutorily subordinated claims, including those for penalties, fines, punitive damages, and rescission damages or indemnity claims arising from securities transactions. This class will receive no distribution under the plan. Although there are no claims yet liquidated which fall in this class, because some unsecured, contingent creditors also seek punitive damages, it is possible that, when those creditors' lawsuits are resolved, some class 8 claims may exist. Classes 9 through 17 are the equity interests of the different debtor entities whose holders will not be receiving a distribution and whose equity interests will be canceled as of the effective date.

All impaired classes voted in favor of the plan with the exception of equity and the statutorily subordinated claims in class 8, which classes were deemed to reject the plan. Class 3, comprising 28 creditors holding $178,003,850 worth of claims, cast 100% of their votes in favor of the plan. Class 4, comprising 30 creditors holding $41,972,376.35 worth of claims, cast 100% of their votes in favor of the plan. Class 5, comprising 17 creditors holding $22,858,738.82 worth of claims, cast 100% of their votes in favor of the plan. Class 6, comprising 884 creditors holding $34,171,037 worth of claims, cast 76.6% of their votes in favor of the plan, encompassing 98.1% of the value of the claims in class 6. Class 7, comprising 64 creditors holding $40,263.67 worth of claims, were not solicited for voting on the plan. Supp.Aff. of Caliolo, ¶ 17 at 8; Hearing on Modification to Third Am. Plan, Tr. 4.[8]

The debtors and the creditors' committee will designate a "plan administrator" to implement the provisions of the plan, subject to the supervision of the boards of directors of Reorganized Leslie Fay and New Sassco.

The Reorganized Leslie Fay board will be composed of seven members, five of whom will be designees of the creditors' committee and the other two of whom will be Pomerantz and his designee. New Sassco's board will likewise be composed of seven members, five of whom will be designees of the creditors' committee and the other two of whom will be Arthur Levine and his designee.

E. *Anticipated Tax Consequences of the Plan*

The debtors intend to treat the sale of assets to New Sassco, which will be necessary to form the two companies, as a "taxable transfer" and simultaneously utilize their substantial net operating losses ("NOLs") to offset the taxes to be incurred as a result of the gain on the contemplated transaction. As a consequence, New Sassco would obtain an aggregate basis in the acquired assets equal to their fair market value as of the effective date and would therefore be able to allocate a portion of the consideration paid to "goodwill." Section 197 of the Internal Revenue Code permits the acquiror to amortize the goodwill over a period of 15 years thereby enabling New Sassco to reduce future taxable income. Neither New Sassco nor Reorganized Leslie Fay will utilize the remaining NOLs because section 382 of the Internal Revenue Code prohibits the use of NOLs to offset future earnings when an "ownership change" occurs, unless certain exceptions which the debtors cannot meet were to apply. The debtors do, however, plan to take advantage of the "stock for debt exception" to the Internal Revenue Code's requirement that income be realized upon a discharge of indebtedness. (Here, since the debtors will be paying creditors less than 100% of the value of their claims, there is some discharge of indebtedness).[9] These anticipated tax consequences are estimates and not based on any representations made by the Internal Revenue Service. Indeed, the debtors disclosed that all $140 million of the

---

8. "Tr." refers to page of the transcript of the hearing on confirmation of the plan.

9. Congress subsequently eliminated the "stock for debt" exception to bankruptcy cases filed on or after January 1, 1994.

NOLs could be lost.[10] Discl. Statement for Am. Joint Plan, ¶ B.2 at 93.

The disclosure statement provides:

[T]he amount of such NOLs is subject to adjustment and is subject to challenge by the IRS. In addition, the fair market value of the Sassco Assets may vary from current estimates and is subject to challenge by the IRS. Were the IRS successfully to assert that less NOLs than expected are available to offset the gain, or that the amount of gain is greater than estimated, Reorganized Leslie Fay could incur a federal income tax liability on the transfer of the Sassco Assets (exclusive of [the alternative minimum tax]), which liability could be significant.

*Id.* ¶ B.1(b) at 92.

## F. *The Historical Operation of the Companies*

Pursuant to the plan, the debtors propose to pool the assets of all nine debtors and then satisfy all claims from the assets of the single consolidated estate. As a result, intercompany claims and cross-corporate guarantees will be eliminated.

The officers and directors of The Leslie Fay Companies, Inc. ("the parent company") have been the officers and directors of each of the subsidiaries and vice versa; thus, the debtors have operated under unified management, direction, and control. Tr. 409. Corporate policy for all of the debtors has historically been set and implemented by the parent company's officers and board of directors; the subsidiaries' boards have not met, relying instead on discussions had at meetings of the parent company's board. The parent company's board approved operating budgets and capital expenditures, terms of leases, employment agreements, decisions to promote or cease product lines, and decisions to open, expand, or close offices, distribution or production facilities. The companies have filed only consolidated federal tax returns and disseminated only consolidated financial information to the creditors and the public. There is in place a consolidated cash management system whereby the debtors' funds were collected and transferred daily to a main account before they were transferred out to individual disbursement accounts. This was done without regard to the entity responsible for the generation of such funds, the ability of the user entity to repay the funds, or the use of formal promissory notes. Tr. 413. Warren Wishart, Leslie Fay's treasurer and chief financial officer, testified that the companies were run in the interests of the parent, citing, as an example, the fact that the parent company did not compensate the licensing company subsidiary for its use of the subsidiary's trademarks. Tr. 413, 420–22. Further, Wishart testified that the substantive consolidation of the estates would not harm the general unsecured creditors in class 6. Tr. 405–06.

## G. *Feasibility of the Plan and the Best Interests of Creditors Test*

In March 1993, Leslie Fay began consulting Warren Wishart, who had more than ten years' experience heading up the business planning processes of various large retail companies. Tr. 377. Wishart had also performed a one-month-long feasibility study for a New York retail manufacturer to assess the viability of a set of stores using their own product. At the beginning of his consulting relationship with Leslie Fay, Wishart's primary emphasis was on Leslie Fay's financial restructuring. He was subsequently employed by Leslie Fay in June 1993, starting out as its vice president of planning and then adding the titles of senior vice president of finance in January 1995, and treasurer and chief financial officer in September 1995. Tr. 375–76.

Wishart and the other members of Leslie Fay's management team provided financial forecasts for both Reorganized Leslie Fay and New Sassco. They predict net sales for Reorganized Leslie Fay to increase from the

---

**10.** The notes to Leslie Fay's 1995 consolidated, audited financial statement (annexed to the disclosure statement) reveal that at December 30, 1995, there were NOLs of $141,600,000 available as carryovers of which $23,400,000, $58,800,000 and $59,400,000 will expire in 2009, 2010, and 2011, respectively, to the extent not utilized. Discl. Statement for Am. Joint Plan, Ex. C at F–18.

1997 projection of $123 million to approximately $145 million in the year 2000. This represents a four year annual growth rate of 5.4% based in part on Leslie Fay's described "recovery of a portion of the 'store' and 'door' penetration previously achieved and through the intensification of Special Sizes distribution." Discl. Statement for Am. Joint Plan, at 74. Gross profits are projected to increase over the next few years due to Reorganized Leslie Fay's expanding its business segments, shortening production cycles, and implementing a "cut to order" business. Leslie Fay predicts that the strategies it implemented in 1995 to reduce headcount and obtain lower lease rates will also improve Reorganized Leslie Fay's general and administrative expenses. Id.[11]

Management expects net sales for New Sassco to grow from a level of approximately $313 million in 1996 to approximately $373 million in the year 2000, a four-year compounded annual growth rate of 4.8%. The increase would be driven in part by New Sassco's sportswear line and the Nina Charles knitwear business, in addition to the planned expansion of the retail segment of New Sassco. With an increase in sales will come an increase in gross profit due in part to a planned reduction in wholesale markdowns to be achieved through better managing of inventories.

Wishart and the other members of Leslie Fay's management team prepared an unchallenged liquidation analysis of the companies on a consolidated basis assuming that Leslie Fay discontinued its operations within the context of a chapter 7 case and within one year sold off its assets in order to pay creditors. Management calculated that Leslie Fay would have a liquidation value of approximately $183 million with proceeds of approximately $83 million available to pay unsecured creditors, after Leslie Fay paid the costs of administration and priority creditors in full. The debtors believe that $327 million in unsecured claims will be allowed. Tr. 157, 369. Accordingly, in a hypothetical liquidation, the unsecured creditors would receive

approximately 25 cents on the dollar and equity would be wiped out. Tr. 384–88.

The Blackstone Group ("Blackstone"), the debtors' financial advisors, estimated the value of the ongoing enterprises utilizing three different, generally accepted methodologies. Blackstone values Reorganized Leslie Fay at between $20 and $30 million and New Sassco at between $220 to $260 million, leading to mid ranges of $25 million and $240 million, respectively, for a total value of $265 million. Blackstone estimated the range of the reorganized value based upon information available as of November 15, 1996, and took into account (i) historical financial information of the debtors, (ii) internal financial and operating data of the debtors, including management's financial projections, (iii) information accumulated based upon interviews with management regarding future operations, (iv) publicly available financial data of comparable public companies, and (v) relevant economic and industry information. In estimating the reorganization value of the reorganized entities, Leslie Fay used the mid ranges of the values projected by Blackstone.

Wishart testified in support of the feasibility of the plan. Whereas he admitted that the range of value for Reorganized Leslie Fay was a "pretty rough estimate," he testified that he participated in the preparation of the estimated values and future financial earnings and analyzed the projections "line by line," "customer by customer," and "business by business." Tr. 430–31. Those projections, he testified, are reasonable.

Wishart also testified regarding the proposed use of the NOLs. Tr. 442–51. He said that if the IRS does not acquiesce in the proposed taxable transaction (and the accompanying recording of goodwill), the value of New Sassco would be different from the $220 to $260 million assumed for purposes of the plan. Tr. 444–45. In addition, New Sassco would incur "substantial amounts" of income taxes in the future which would not be offset by the amortization of goodwill. Tr. 445. This would affect New Sassco's ability to

---

**11.** Given that there is no quarrel with these projections, I will not lay out the financial condition and results of operations of the companies from

1993 through 1995. This information may be found in the Disclosure Statement for the Amended Joint Plan, Ex. C at 26–31.

make payment on the notes. Tr. 445. Wishart testified that, although he was not qualified to give an opinion on whether the IRS would agree with the proposed tax treatment, he relied on the tax advice of representatives of Weil Gotshal, Wachtell Lipton, and Arthur Andersen. Whereas Wishart testified that he could not quantify the amount of the effect of an adverse IRS ruling, he admitted that the effect would be substantial. Wishart also explained that the transaction could then be treated as a nontaxable one and the NOLs used in a different way. The disclosure statement explains that the IRS has yet to pass on the planned tax treatment and contains disclaimers with respect to a possible adverse determination by the IRS. Discl. Statement for Am. Joint Plan, at 72, 88–90.

On the effective date, Reorganized Leslie Fay and New Sassco will have entered into credit agreements with their post confirmation lenders, The CIT Group and First National Bank of Boston, N.A., respectively. The CIT Group will provide a secured, two year working capital facility for up to $30 million for Reorganized Leslie Fay. Tr. 142. Wishart testified that this working capital will provide Reorganized Leslie Fay with sufficient financing to continue operations and meet its financial obligations for at least the next two years, at which time Reorganized Leslie Fay will have generated sufficient cash through operations to have the ability to refinance its obligations on a long-term basis.

The First National Bank of Boston, N.A. will provide a secured, three-year working capital facility of up to $100 million to New Sassco.[12] Wishart testified that the working capital facility will be sufficient financing to continue New Sassco's operations and meet its financial obligations for at least the next three years, at which time New Sassco will have sufficient cash reserves as a result of operations to have the ability to refinance without the need for further restructuring.

Leslie Fay needs $22 million to consummate the plan. Priority claims are approximately $6 million and the administrative claims approximately $16 million (half of which are unpaid professional fees from earlier in the cases). Tr. 400. In addition, on the effective date, Reorganized Leslie Fay will need $8 million in working capital, bringing the required cash at the effective date to $30 million. Tr. 400–01. But on the effective date, Leslie Fay will have only about $12 million. Tr. 400. To address the $18 million shortfall, the proponents earlier amended the plan (and resolicited votes) to provide that $4 million of the administrative expenses will be deferred, with the consent of the professionals, to April 30, 1997, and that New Sassco will issue a $4 million intercompany note payable to Reorganized Leslie Fay. *See* Supp.Discl.Statement for Second Am. Joint Plan, at 2. Wishart testified that the New Sassco projections show that its business will generate more than the needed $8 million in cash by April 30, the time when both intercompany notes will fall due. Tr. 402. And, if New Sassco does not meet its projections, those payments may be made out of borrowings under New Sassco's credit facility. The other $10 million will be paid by New Sassco on the effective date from its exit financing facility.

## H. *Management Contracts & Options to Purchase Stock*

On the effective date, Arthur Levine, the president of Leslie Fay's Sassco division since 1980, will enter into an employment agreement with New Sassco for a period of five years and he, along with other members of his management team, will receive options to purchase up to 22.5% (in the aggregate) of the New Sassco Common Stock. On the effective date, New Sassco will grant Levine and his team options to purchase 10% of New Sassco common stock, twenty-five percent of which will vest immediately on the effective date, with the remainder vesting in equal amounts over the next five years on each of

---

**12.** Pursuant to the plan, New Sassco will have also issued $110 million in interest bearing, senior, unsecured New Sassco notes on which there will be no principal payments for a five-year period following the effective date, although interest will accrue at 12¾% semiannually and shall be paid semiannually in arrears, provided that the first such interest payment shall be due and payable on September 30, 1997. Tr. 144–45; Modification of Am. Joint Plan, at 2.

the first five anniversaries of the effective date. Third Am. Joint Plan, Ex. A, ¶¶ A(i), B(i) at A–1. The remaining 12.5% of the New Sassco management options will be contingent upon earning targets set for the next few years and will vest, for the most part, in accordance with the same schedule for the vesting of the initial options (as if they had been granted on the effective date). *Id.* ¶¶ A(ii)–(v), B(iii).[13] In addition, "[a]fter the effective date, the New Sassco board will have the authority to establish a program pursuant to which New Sassco will grant one or more members of management of New Sassco, options to purchase 2% of the New Sassco Common Stock, all on terms and conditions established by the New Sassco board *of directors in its discretion.*" Third Am. Joint Plan, at 20; *see also* Discl. Statement for Am. Joint Plan, § G.2(d)(ii) at 50.[14] The exercise price of the New Sassco common stock options will be "the average market price of New Sassco Stock during the (i) ten days before the thirtieth day after the Effective Date and (ii) ten days after such thirtieth day." Third Am. Joint Plan Ex. A, ¶ B(v) at A–2. The options are exercisable for specified periods of time before they expire, based upon the date the options become vested or anniversary dates related to the vesting date or some other identified date such as termination for cause, termination without cause, death, or permanent disability. All *vested* options must be exercised on an expedited basis if the management recipient is terminated for cause, voluntarily retires, or resigns other than for good reason. Plan Supp., Ex. R, § 5(g) at 8; Third Am. Joint Plan, Ex. A, ¶ B(viii). However, all *non-vested* options are automatically forfeited if the manager is terminated for cause, volun-

tarily retires, or resigns other than for good reason. Plan Supp., Ex. R, § 5(i) at 8. Vesting will occur automatically upon the death, permanent disability, termination without cause, or resignation for good reason of the management recipient. Third Am. Joint Plan, Ex. A, ¶ B(ii). Cause is defined as (i) conviction of a felony; (ii) dishonesty in fulfilling employment duties; or (iii) willful or deliberate failure to perform employment duties in a material respect. Plan Supp., Ex. R, § 1(c) at 1. In brief, "good reason" for resignation is defined in Levine's management contract as, among other things, (i) New Sassco's termination of Levine from his position as chief executive officer or Levine's failure to be reelected to the board during the term of his employment contract, except for cause; (ii) New Sassco's material failure to comply with Levine's employment contract; or (iii) a change of control occurring. Third Am. Joint Plan, Ex. B, ¶ C(iv) at B–2.

On the Reorganized Leslie Fay side, John J. Pomerantz, John Ward, Cate Bandel, Dominick Falcetti, and Warren Wishart will have one-year employment contracts. Third Am. Joint Plan, Ex. C, C–1.[15] On the effective date, these managers will receive nontransferable options to purchase 5% of Reorganized Leslie Fay common stock (in the aggregate) which will vest on each of the first three anniversaries of the effective date, *"provided however,* that all options will vest immediately upon a change of control." Third Am. Joint Plan, Ex. D, ¶ A at D–1. In addition, these managers will receive options to purchase another 5% of Reorganized Leslie Fay common stock if Reorganized Leslie Fay meets certain earnings targets keyed to EBITDA,[16] which will vest on each of the

---

13. If the corporation achieves earnings before interest, taxes, depreciation and amortization ("EBITDA") of at least $29,000,000 in the 1997 fiscal year, stock options will be granted for an additional 5% of the common stock. If the corporation achieves EBITDA of $33,000,000 in the 1998 fiscal year, stock options will be granted for an additional 5% of the common stock. If the corporation achieves EBITDA of $44,000,000 in or before the 2001 fiscal year, stock options will be granted for an additional 2.5% of the common stock.

14. The New Sassco vested and nonvested management stock options will be transferable in

accordance with the timetable embodied in exhibit A to the plan.

15. Although the management contracts were not annexed to the plan, exhibit C to the plan summarizes the material terms. Termination without cause is defined to include Reorganized Leslie Fay's failure to renew the Reorganized Leslie Fay senior management contracts at the end of their one-year term.

16. If the corporation achieves an EBITDA of at least $4.2 million (excluding Castleberry and Hue), stock options will be granted for an additional 5% of the common stock.

first three anniversaries of the grant, *"provided however*, that all options will vest immediately upon a change of control." *Id.* ¶ B. The Reorganized Leslie Fay managers will also receive options to purchase another 2½ to 7½% (in the aggregate) if a business combination, underwritten equity offering, or other similar corporate transaction imputes a value to Reorganized Leslie Fay of $37.5 million to in excess of $100 million. *Id.* ¶ C.[17] The strike price for the Reorganized Leslie Fay management options will be $6.18 per share. *Id.* ¶ A. The stock options shall be good for at most ten years from the date of the grant, provided however, that death, disability, retirement, or other termination (except for cause) shortens the life of the options. *See* Plan Supp., Ex. S, § 5(f)–(i) at 7–8. And if the management recipient retires, dies, becomes disabled, or leaves the company for any reason (other than cause), all nonvested options are terminated. *Id.* § 5(f), (g), (h), and (i). However, a termination for cause shall terminate all vested and nonvested stock options held by the recipient. *Id.* at § 5(i). Whereas none of these options is exercisable on the effective date, "in the event of a Change in Control, any Stock Options (other than [the last 2½ to 7½ percent]) outstanding as of the date of such Change in Control is determined to have occurred, and which are not then exercisable and vested, shall become fully exercisable and vested to the full extent of the original grant." *Id.* § 7(a) at 9; *see also* Discl. Statement for Am. Joint Plan, ¶ G.3(b) at 51.

## I. *Current Management's Alleged Wrongdoing*

The Claimants repeatedly assert that Leslie Fay's current management is corrupt such that I must deny confirmation, allow the Claimants' claims, and appoint an independent trustee. The plan is said to be defective because it "perpetuates the influence and conflicts of interests on the part of John J.

Pomerantz and the former members of the management of Leslie Fay." Claimants' Obj. ¶ 8(c) at 4. The Claimants suggest that management's self-dealing continued even after the reorganization case was filed. In support, they point to (i) the release agreement of Laura Pomerantz, a former vice president of the company who is the wife of John Pomerantz, and (ii) the minutes of a board meeting held on November 12, 1996.

Laura Pomerantz's agreement embodied in exhibit L recites that Leslie Fay is giving Laura Pomerantz "an additional termination" benefit of $1,069,579.22, in consideration for her releasing claims against Leslie Fay under the Age Discrimination in Employment Act ("ADEA") and the Civil Rights Act of 1991, among other similar laws. The agreement purports to release Ms. Pomerantz from any and all claims of Leslie Fay arising out of her employment, but releases Leslie Fay only from Ms. Pomerantz's ADEA claims, expressly carving out Ms. Pomerantz's rights to defense or indemnity under the by-laws, or any other rights due her as a result of her employment or termination. The validity of the release given to Ms. Pomerantz is questionable. *See* Ex. N, Leslie Fay by-laws, art. 6 at 16 (requiring vote of disinterested board); Tr. 232–45 (no such vote conducted). Moreover, notice and a hearing were not provided to interested parties, nor was court approval sought or obtained. As reflected in exhibit Q, the amount that Laura Pomerantz was due pursuant to her employment contract comports exactly with the amount she received as the "additional termination benefit" under her release agreement. And, at some point, the $1,069,-579.22 was reclassified as severance on the company's books and records. When I raised my own confusion about this issue and its possible effect on Laura Pomerantz's ability to continue to assert a claim under her employment contract,[18] by letter dated

---

17. If the corporation shall effect a reorganization, merger, or consolidation or sale of substantially all of the assets of the corporation, or an underwritten equity offering of at least 50% of the outstanding shares, pursuant to which the enterprise value imputed is at least $40 million to an amount in excess of $100 million, the remaining 2½ to 7½% of the options will be granted, depending on the value imputed to the company.

18. Laura Pomerantz did not have an employment agreement prior to June 30, 1994, and received one only after the debtors sought court approval to enter into the agreement for the stated purpose of ensuring her continued em-

March 14, 1997, Ms. Pomerantz waived any claims against the estate pursuant to her employment contract, except to the extent that she is entitled to indemnification.

The second basis for the Claimants' argument lies in a board meeting held on November 12, 1996, at which Leslie Fay decided to treat its factoring expenses not as operational expense but as interest expense. Ex. C at 2. The Sassco division had already made this change, which is common practice in the industry, in February 1996. The change for Leslie Fay was made to conform its record keeping with that of the Sassco division. An effect of this change is to increase EBITDA, thereby affecting the base upon which management bonuses are calculated. However, Joan Ruby, Leslie Fay's general counsel and corporate secretary, and Wishart both testified that this change has no effect on Leslie Fay's EBITDA for 1996 because Leslie Fay had no factoring expense in that year and further that 1996 bonuses are calculated without reference to the Sassco division. Test. of Ruby, Tr. 294–97; Test. of Wishart, Tr. 422–27. To the extent this change would affect Reorganized Leslie Fay's EBITDA in 1997 and thereafter (since Leslie Fay has now begun to factor), Reorganized Leslie Fay's new board of directors will decide how to treat factoring expenses. Wishart testified that this idea occurred to a member of the creditors' committee who believed it would improve the value of the securities for the companies.[19]

The Claimants' sole witness with respect to current management's alleged wrongdoing was Raymond J. Terwilliger, the former vice president of human resources for all of Leslie Fay. Terwilliger was employed by Leslie Fay for sixteen years before he was terminated in August 1992. Terwilliger's main

ployment as Executive Vice President of Leslie Fay. She was to be primarily responsible for operating the Leslie Fay's theomiles and Castleberry divisions. Pursuant to the agreement she was to be employed for a two year period (and potentially for a third year if earnings targets were met) and paid $500,000 annually with certain bonuses payable if specified earnings targets were met. Pursuant to the agreement, if Ms. Pomerantz were terminated for reasons other than cause before the expiration of the two years, her earnings targets would be deemed met and she would receive as severance the full amount of the bonuses described under her contract.

In the motion seeking approval of Ms. Pomerantz's employment agreement, the debtors represented that:

Over the past few years, Ms. Pomerantz coordinated and led the effort to design and develop the theomiles label which was first launched in January, 1993 for shipment in Fall of that year, immediately before Leslie Fay's disclosure of the accounting irregularities. The theomiles label represents an aggressive initiative by Leslie Fay to target a more modern consumer, focusing on "better" priced apparel in such categories as career sportswear, dresses and evening wear. Leslie Fay projects that, under Ms. Pomerantz's leadership, the theomiles label will experience long term sales growth and make a significant contribution to profits. Typically, a brand new name or label requires a minimum of a two to three year development period before achieving profitability. Despite the negative impact of the accounting irregularities which was compounded by the chapter 11 filings, for fiscal year 1994, theomiles and Castleberry are projected to have a positive contribution, representing a significant turnaround from its [sic] negative performance in 1993.

Ex. R ¶ 29 at 17–18.

During the two day hearing on whether or not to approve Laura Pomerantz's employment contract, I expressed my concern that under the agreement, whether or not Leslie Fay decided to continued to employ Ms. Pomerantz, Leslie Fay would still be obligated for her salary and bonuses. A representative for Leslie Fay testified that he did not believe that her employment would be terminated in the next twelve months. Tr. at 64–66 (June 29, 1994). After the two day contested hearing, I approved the debtor's agreement with Ms. Pomerantz. However, notwithstanding the expressed expectation that Ms. Pomerantz would be retained for at least twelve months, on or about November 1, 1994, Leslie Fay discontinued both its theomiles and Castleberry divisions and terminated Laura Pomerantz's position.

19. In further support of their theory that senior management is corrupt, the Claimants also submit a summary of stock transactions during the period May 1990 through November 1993, by directors Stephen Friedman, Alan Golub, Ira Hechler, Jack Nash, Joel Newman, Lester Pollack, John Pomerantz, and other officers or related entities, Andrew Gross, Ralph Iannozzone, Sanford Mazer, Roger Murray, Paul Polishan, Laura Pomerantz, Odyssey Partners, Richard Von Felde, and Gerald Zipp. Ex. O. The summaries indicate that all sixteen people or entities summarized earned more on distributions than they spent on acquisitions during the period summarized. The Claimants ask that I draw an inference therefrom that current management engaged in wrongdoing. However, the bare statistics are insufficient to lead to that conclusion.

contention is that John Pomerantz, the chairman of the board and chief executive officer; Herman Gordon, the former senior vice president and general counsel; and Alan Golub, the former president and chief operating officer, knew full well the extent to which Paul Polishan was "cooking the books" of Leslie Fay. To support this contention, however, Terwilliger offers mostly incredible and contradictory accounts of circumstances during which Pomerantz or other members of senior management were allegedly notified.

Terwilliger testified at the confirmation hearing that he told senior management on two specific occasions that Polishan was altering financial results. Tr. 493. Terwilliger drew this conclusion because several friendly divisional comptrollers had on more than one occasion informed him that Polishan was forcing them to input "plug numbers" into their financial results and was also perpetrating "inventory problems." Tr. 497. Terwilliger testified that the past president of the outlet stores, Steve Rosenthal, complained to him "bitterly about certain things regarding falsified records that he had to deal with in the outlet stores." Tr. 497. Terwilliger said that he was also in close contact with Dan Falkowitz, the treasurer of Leslie Fay, and Terry Irwin, the manager of Leslie Fay's budget, audit and tax department. Tr. 502. Falkowitz supposedly told Terwilliger "many, many times about Paul's inaccuracies, false statements, and deceptions." Tr. 549, 561. Terwilliger explained that both Falkowitz and Irwin had shared with him their frustrations in handling the audit function within the company because of the fact that the audit committee never met and that either Polishan or Kenia would consistently deny them access to information necessary to perform their internal audit duties. Terwilliger testified, "I know that Mr. Falkowitz had corresponded directly with Mr. Pomerantz and I believe also directly with Mr. Newman explaining to both at length the kinds of problems he was having in discharging the audit function within Leslie Fay because of Mr. Polishan's interruptions and failure to provide information and general uncooperative nature." Tr. 506.

Terwilliger referred to a letter that Falkowitz had written to John Pomerantz both in draft and final form. He recalled the letter's stating that Falkowitz was having personal difficulties performing the audit function and needed additional staff. When asked if Polishan's name was mentioned in the letter, Terwilliger could not recall if it was. He said that he did recall that there was no mention of the use of plugged numbers or false financial statements. Terwilliger then recalled that there was a Falkowitz letter to Newman, Falkowitz's superior, and further that he had seen that letter as well. Terwilliger testified that although Polishan's name was not mentioned in that letter either, Falkowitz's letter to Newman did reference Falkowitz's inability to perform his audit function due to being denied access to records, financial statements, and the like. Tr. 518. However, even if Terwilliger's recollection about Falkowitz's letter to Newman is true, I cannot assume that Newman showed that letter to Pomerantz. And Terwilliger's testimony about Falkowitz's letter to Pomerantz does not establish Pomerantz's wrongdoing; at best it suggests that Pomerantz knew of Falkowitz's personnel shortage. But that is not the allegation Terwilliger makes here; Terwilliger asserts that current senior management had actual knowledge of wrongdoing.

The first time Terwilliger says that *he* notified senior management that Polishan was falsifying financial statements was in January 1991; Terwilliger told Joel Newman, Leslie Fay's chief operating officer and vice chairman of the board, and Herman Gordon, Leslie Fay's legal counsel, that the best thing they could do for Leslie Fay would be to "get rid of Polishan." Tr. 496. Terwilliger says he told both Newman and Gordon that Polishan was using "plug numbers" and "falsifying records" respecting the financial results of divisional operations in order to achieve some desired economic result for the financial statements. Tr. 495–97. Terwilliger testified that Newman did not respond but Gordon said, "Come on Ray, you know that they are not going to replace him."

Terwilliger testified to informing senior management of Polishan's wrongdoing a sec-

ond time during a meeting held in October 1991. The purpose of the meeting was to discuss the problems Leslie Fay was having with its employees. At the close of the meeting, Terwilliger informed everyone that contrary to what Polishan had reported, Polishan was the "reason why there was a union organization going on because the employees were so sick and tired of the way they were treated by Polishan." Tr. 510. Terwilliger and Polishan then engaged in a heated exchange after which Polishan left the meeting. Terwilliger seized the opportunity to speak with Golub and Pomerantz. He testified, "My comments pertained to his lack of character, my comments pertained to his lack of integrity, my comments pertained to the kind of comments the divisional comptrollers had made to me about the accuracy and the veracity of his financial statements, as well as the discriminatory things that he did." Tr. 510–11. Terwilliger testified that at this time he "absolutely" informed Golub and Pomerantz that the divisional comptrollers were complaining about "Polishan's competence; the use of plug numbers; the reference to inaccuracies; [and] the reference to being forced to make financial statements turn out the way he wanted them to." Tr. 511. Pomerantz is said to have responded that he had not believed Falkowitz but that he believed Terwilliger.

However, Terwilliger's testimony at the confirmation hearing with regard to his telling John Pomerantz or others in senior management about Polishan's use of "plug numbers" and resulting false financial statements does not comport at all with his March 1996 testimony in the class action litigation, which I will discuss shortly. Nor does it comport with his actions during that time or thereafter. For example, he has repeatedly applied for reemployment notwithstanding the fact that Gordon, Golub, and Pomerantz remain on the Leslie Fay board of directors and that Pomerantz also remains as chief executive officer. In addition, at no point did he tell his story to any governmental authority, even post-bankruptcy when the newspapers reported that an audit committee investigation was underway.

At his deposition in the class action litigation, he was asked, "I am just trying to nail down this one point, though, what is it that you specifically recall telling John Pomerantz about the extent to which Paul Polishan or his people were manipulating the numbers?"

Terwilliger replied:

I specifically told John Pomerantz that Polishan was the source of the problem with the union organizational attempt— was the source of all forms of unrest within the work force and specifically referenced his lack of ability as an accountant and as it related to the financial statements. I didn't say the word plugged number, I did say the word incompetent.

Tr. 545.

Terwilliger was then asked again, "In any of your conversations with John Pomerantz or conversation at which you were present, did anyone raise the issue of manipulation of inventory numbers with John Pomerantz?" After a lengthy speech about his distaste for Polishan, Terwilliger responded, "They choose for their own benefit to say it's a matter of personal hatred [of Polishan], I am telling you my reference was to his incompetence." Tr. 547.

So, in response to two direct questions about whether he told Pomerantz or heard of anyone else telling Pomerantz of the false financials or the use of plug numbers, Terwilliger indicated that he did not. He did not mention telling Newman or Gordon about plugged numbers and false financials, he did not mention Falkowitz's letters, and he did not mention having told Pomerantz that the divisional comptrollers were being forced to use plug numbers. His only explanation now as to his contradictory testimony is that he does not believe that his testimony is inconsistent. Tr. 547. I disagree. Terwilliger avoids answering direct questions asked of him, offering instead irrelevant speeches which ignore the pointed question completely. See, e.g., Tr. 549, lines 14–19; Tr. 558–59, lines 9–25 and lines 1–7; Tr. 545–47.[20] In-

20. For example,

Q: Did Mr. Falkowitz tell you that he had verbally—orally, I should say, or in writing

deed, I have the distinct impression that he invents things as he goes along. *See* Tr. 519, 520, 535, 536, 552.[21] Unfortunately, I must discount his testimony.

On the other side of the table, Joan Ruby, the current in-house counsel, who will not remain with the reorganized debtors after the effective date, believes there are no claims against current management for fraud, gross negligence, or wrongful receipt of personal profits. Ruby is not aware of any pending criminal actions against members of current management or any instance where any member of current management has invoked his or her Fifth Amendment privilege against self-incrimination.

## II.

### A. *Substantive Consolidation*

■ Substantive consolidation derives from the bankruptcy court's general equitable powers provided in section 105(a) of the Bankruptcy Code. *Federal Deposit Ins. Corp. v. Colonial Realty Co.*, 966 F.2d 57, 58 (2d Cir.1992); *In re Deltacorp, Inc.*, 179 B.R. 773, 777 (Bankr.S.D.N.Y.1995) (citations omitted). "The substantive consolidation of estates in bankruptcy effects the combination of the assets and the liabilities of distinct, bankrupt entities and their treatment as if they belonged to a single entity." *Colonial Realty Co.*, 966 F.2d at 58 (citing 5 L. KING, COLLIER ON BANKRUPTCY, ¶ 1100.06 at 1100–33 (15 ed. 1991)).

Unlike joint administration (also referred to as procedural consolidation), which does not

> affect the substantive rights of claimants of the respective debtor estates, substantive consolidation merges the separate estates into one estate for distributive purposes. Usually, the assets and liabilities are shared, with duplicate claims being eliminated and intercompany claims being extinguished.

*In re Deltacorp, Inc.*, 179 B.R. at 777 (footnote and citation omitted).

"Substantive consolidation usually results not only in the pooling of assets and liabilities of two or more entities, but also in satisfying liabilities from the resultant common fund; eliminating inter-entity claims; and combining the creditors of the two entities for purposes of voting on reorganization plans." *Colonial Realty*, 966 F.2d at 58–61 (internal quotation and citation omitted). The Second Circuit has required that substantive consolidation be invoked "sparingly because of the possibility of unfair treatment of creditors." *Id.* at 61 (quotation and citations omitted).

■ "The sole purpose of substantive consolidation is to ensure the equitable treatment of creditors. Numerous considerations have been mentioned as relevant to determining whether equitable treatment will result from substantive consolidation." *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2d Cir.1988) (citing cases), *aff'g, In re Augie/Restivo Baking Co., Ltd.*,

told Pomerantz that Mr. Polishan's financial statements were false?
A: Dan was a—is a CPA, Paul was not. Dan occupied Paul's position before Paul did. Dan had commented to me many, many times about Paul's inaccuracies, false statements, deceptions.
Tr. 549.

21. At the confirmation hearing, Terwilliger testified that Leslie Fay was (i) destroying boxes of documents clearly marked, "Do Not Destroy," (ii) some of which were destroyed after the accounting irregularities came to light where witnesses allegedly informed Terwilliger that "shredders were running overtime" and (iii) that some people actually told him that they saved documents during this latter time in order to protect themselves against ramifications of Pol-

ishan's wrongdoing. At his deposition in the class action, however, in response to a question about where documents might be found, he mentioned nothing about the destruction of boxes clearly marked "Do Not Destroy." He said that documents could be found in the dumpster, but made no reference to the employees who had supposedly told him that they saved some documents or that Polishan had run the shredders overtime in late January 1993. When prompted again as to why he did not go to the authorities or to the audit committee, he testified that he did not know the audit committee was functioning because "I was out of Leslie Fay, I had no contact with anybody." Tr. 543. If he had no contact with anyone, how did he learn of Polishan's shredders running overtime?

84 B.R. 315 (Bankr.E.D.N.Y.1988). An examination of those cases reveals that there are two critical factors in assessing whether substantive consolidation is appropriate:

(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or

(ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.

*Id.* (internal quotation and citation omitted).

■ Here, the record is clear that creditors dealt with the Leslie Fay companies as a consolidated unit and did not rely on any subsidiaries' separate identity in extending credit. As to the second factor, the record is also clear that the debtors' operations, cash, and decision-making were all shared such that it would be detrimental to the estates to attempt to disentangle those operations. Wishart testified that the only classes that would be detrimentally affected by this consolidation have consented to their treatment and further that the only objectants to substantive consolidation (the Claimants) would be the direct beneficiaries of such consolidation. Accordingly, the record amply supports a finding that equity warrants approval of the substantive consolidation of these estates. The Claimants object to substantive consolidation not because the standards for it have not been met but because they say it is improper unless and until senior management have been exonerated of all wrongdoing. Whatever the merit of that proposition, I did not find credible the only witness who testified to the alleged wrongdoing. Substantive consolidation is therefore approved.

## B. *Confirmation Under Section 1129(a)*

Section 1129(a) lays out thirteen requirements for confirmation of a plan of reorganization. Subparagraph (a)(6), which deals with governmental rate regulation, does not apply to these cases. Other subparagraphs are satisfied without objection. These include that the proponents have met the conditions in subsections (a)(1) and (a)(2) requiring that the plan and the plan proponents comply with the applicable provisions of title 11, including classification and solicitation;

that pursuant to subsection (a)(4) the court approve as reasonable any payments made or promised by the debtors, the creditors' committee, or by any person issuing securities under the plan for services or costs and expenses relating to these cases or to the plan; that pursuant to subsection (a)(9) the plan proposes the appropriate treatment of priority claims; that pursuant to subsection (a)(10) at least one class of impaired claims has accepted the plan; and under subsection (a)(12) that all fees payable under section 1930 of title 28 have been paid or will be paid by the effective date.

However, the objections interposed to confirmation of the plan raise the following issues:

a. Was the plan proposed in good faith?

b. Should the members of current management be permitted to continue their roles as managers post-confirmation?

c. Should the members of current management receive any form of release under the plan?

d. Is the release provision embodied in section 37.6 of the plan detrimental to the interests of the estate?

e. Is the injunction provision embodied in section 37.9 of the plan detrimental to the interests of the estate?

f. Should the court enjoin settlement of the class action?

g. Is management's receipt of stock options under the plan violative of the absolute priority rule?

h. Does management's receipt of stock options under the plan unfairly discriminate against equity interest holders?

i. Does the plan properly provide for retiree benefits as required by section 1129(a)(13)?

j. Is the plan economically feasible? and

k. Will the objecting creditors receive at least as much as they would under a hypothetical liquidation?

### 1. Good Faith, § 1129(a)(3)

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be proposed in good faith and not by any means forbidden by law.

11 U.S.C. § 1129(a)(3). Good faith is not defined by the Bankruptcy Code; however, bad faith has been defined as,

> [t]he opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not promoted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. [The t]erm "bad faith" is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of [a] dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.

*In re Resorts Int'l, Inc.,* 145 B.R. 412, 469 (Bankr.D.N.J.1990) (quoting Black's Law Dictionary). The Second Circuit has construed the good faith provision to require a showing that "the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'" *Kane v. Johns–Manville Corp.,* 843 F.2d 636, 649 (2d Cir.1988) (citing *Koelbl v. Glessing (In re Koelbl),* 751 F.2d 137, 139 (2d Cir.1984) (quoting *Manati Sugar Co. v. Mock,* 75 F.2d 284, 285 (2d Cir.1935))); *In re Best Prods. Co., Inc.,* 168 B.R. 35, 72 (Bankr.S.D.N.Y.1994), *appeal dismissed,* 177 B.R. 791 (S.D.N.Y.), *aff'd,* 68 F.3d 26 (2d Cir.1995).

■ "The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan," *In re Piece Goods Shops Co.,* 188 B.R. 778, 790 (Bankr.M.D.N.C.1995) (citing *In re Block Shim Dev. Company— Irving,* 939 F.2d 289 (5th Cir.1991)), which may include considering the debtor's pre-filing conduct. *In re Resorts Int'l,* 145 B.R. at 469 (citing *In re Toy & Sports Warehouse, Inc.,* 37 B.R. 141 (Bankr.S.D.N.Y.1984)).

■ "The primary goal of chapter 11 is to promote the restructuring of the debtor's obligations so as to preserve the business and avoid liquidation." *In re Piece Goods Shops,* 188 B.R. at 790 (citing *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528, 104 S.Ct.

1188, 1197, 79 L.Ed.2d 482 (1984)). Generally, a plan is proposed in good faith " 'if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'" *In re Texaco, Inc.,* 84 B.R. 893, 907 (Bankr.S.D.N.Y.), *appeal dismissed,* 92 B.R. 38 (S.D.N.Y.1988) (quotations omitted); *In re Jorgensen,* 66 B.R. 104, 109 (Bankr. 9th Cir.1986) (a chapter 11 plan is proposed in good faith if the plan proponent has exhibited "a fundamental fairness in dealing with creditors" and if the plan "will achieve a result consistent with the objectives and purposes of the Code.").

■ Here, the plan proposed by the debtors and the creditors' committee accomplishes this goal by providing the means through which the debtors may continue to operate as viable entities in the marketplace. The plan deals fairly with the creditors. The fact that the plan is proposed by the committee as well as the debtors is strong evidence that the plan is proposed in good faith. *In re Piece Goods,* 188 B.R. at 791. Whereas there is little doubt that prior to the filings, Polishan was indeed "plugging" the numbers and thereby creating falsified financial statements, there was no credible evidence presented that Pomerantz or any other member of the board was informed of it. Polishan was terminated before the bankruptcy petition was filed. Ruby testified that she did not believe any claims existed against current management. Ruby also testified that she participated in the plan negotiations and characterized them as arms' length. Tr. 152–54. There has been no evidence other than Terwilliger's testimony, which was vastly different from what he had testified to in the class action litigation, that Pomerantz or anyone currently managing Leslie Fay knew or was informed of the misstatements in Leslie Fay's books. The fact that Terwilliger may have characterized Polishan as "incompetent" does not suggest that the plan was not filed with honesty and good intentions and without an expectation that reorganization can be effected.

#### a. The Propriety of the Release Provision

A related issue raised by the Claimants and argued to evidence the bad faith of the

plan proponents is the existence of the limited release provision embodied in section 37.6 of the plan. It releases only claims by the debtors against individuals that served during the chapter 11 case. Therefore the release provision would not affect claims against Kenia, for example.[22] Nonetheless, objecting to both its existence and scope, the Claimants urge that this provision demonstrates the bad faith of management. The debtors, on the other hand, argue that section 37.6 is simply a matter of fundamental fairness because it recognizes the efforts of those who have worked closely with the creditors to develop a consensual plan of reorganization and gives them only the protection they otherwise would have had under the by-laws of Leslie Fay had the company not entered bankruptcy. *See* Hearing on Plan Modification, Tr. at 41–43 (Mar. 18, 1997). In addition, the proponents point out that the release provision was negotiated at arms' length by counsel for the various officers and directors involved on the one hand, and counsel for the creditors' committee on the other, and was therefore approved by the representatives of the very people who will become owners of the reorganized debtors under the plan. Counsel for the debtors was not involved in the negotiations regarding the releases.[23]

Courts have concluded that public policy favors a limited immunity in order to encourage parties to actively participate in reorganization cases. Michael Berman, *Bankruptcy Developments*, 927 PLI/CORP, 7 at *75 (Mar. 1996) (citing *In re Tucker Freight Lines, Inc.*, 62 B.R. 213 (Bankr.W.D.Mich.

1986); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717 (Bankr.S.D.N.Y.), *aff'd*, 140 B.R. 347 (S.D.N.Y.1992)); *see also In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 773 (Bankr.S.D.N.Y.1992); *In re Texaco Inc.*, 84 B.R. at 904; *In re Envirodyne Indus., Inc.*, No 93 B 310, 1993 WL 566565, *17 (Bankr.N.D.Ill. Dec. 20, 1993) (release predicated on an extensive investigation).

I am overruling the Claimants' broad objection to the presence of any release provision in the plan. I agree that fundamental fairness demands that management be rewarded for actively participating in the bankruptcy case and bringing the case to a largely consensual resolution. We turn to the scope of the release.

The release provision originally contained in the plan provides:

> As of the Effective Date, the Debtors shall be deemed to have waived and released their present and former directors, officers and employers who were directors, officers and employees, respectively during the Chapter 11 Cases and on or before April 5, 1993, from any and all claims of the Debtors, including, without limitation, claims which the Debtors or Debtors in Possession otherwise have legal power to assert, compromise or settle in connection with the Chapter 11 Cases, arising on or prior to the effective date; *provided, however,* that this provision shall not operate as a waiver or release of any claim (i) in respect to any loan, advance or similar payment by a Debtor to any such person, (ii) in respect of any contractual obligation owed by such

---

**22.** Polishan was suspended from his position as chief financial officer prepetition, but was not terminated until postpetition. Therefore, in theory, Polishan would be covered by the release provision embodied in section 37.6 of the plan. However, Polishan was indicted on the grounds of fraud, and in actuality, because the debtors have carved out from the release provision breaches of fiduciary duty, fraud, and gross negligence, among other things, the debtors' claims against Polishan would still subsist.

**23.** Mark Abramowitz from Parker Chapin Flattau & Klimpl represented Mr. and Mrs. Pomerantz, Gordon, and Golub in the negotiation of section 37.6 of the plan. Tr. 210–11, 171. Abramowitz also represents the same persons and third party defendants Arthur Levine, John

Ward, and Gerald Zipp in the class action. *See* Claimants Obj. to Second Supp.Discl.Statement, Ex. B. Parker Chapin simultaneously represents the debtors as special counsel to (a) assist the debtors in maintaining compliance with the SEC and New York Stock Exchange reporting and disclosure requirements; (b) assist in negotiating and complying with ERISA, labor, and real estate matters; and (c) assist the debtors with regard to asset acquisition and dispositions which arise outside the bankruptcy context. Notwithstanding this apparent concurrent representation, the validity of section 37.6 of the plan is not tainted because, as described above, section 37.6 was negotiated on behalf of the estate by Wachtell Lipton for the creditors' committee.

person to any Debtor, (iii) relating to such person's fraud or gross negligence or (iv) to the extent based upon or attributable to such person gaining in fact a personal profit to which such person was not legally entitled, including, without limitation, profits made from the purchase or sale of equity securities of the Debtors which are recoverable by the Debtors pursuant to section 16(b) of the Securities Exchange Act of 1934, as amended.

Third Am. Joint Plan, § 37.6.[24]

In the disclosure statement, the debtors assured the creditors that "any ... derivative claims that might be asserted by the Debtors against present and former directors, officers, and employees are not waived or released under Section 37.6 of the Plan." Discl. Statement for Am. Joint Plan, ¶ C.2 at 33.

■ The thrust of the Claimants' objection to the breadth of the release provision was its possible impact on insurance proceeds possibly available in the derivative action. The complaint in that action alleges a variety of claims against members of Leslie Fay's current and former management. Some of the those claims are for ordinary breaches of fiduciary duty which might be released under section 37.6. *See* Tr. 183. Whereas those breaches might be indemnified by Leslie Fay under its by-laws had they been brought by third parties, specific provisions in those by-laws carve out an exception to that rule when the action is brought on behalf of the corporation itself.[25] And the executive protection insurance policy covers those same losses, provided the corporation's suit against its

officers and directors is brought derivatively without the solicitation, assistance, or participation of the company or the officers or directors. *See* Ex. F. In this vein, because there is already a derivative action pending which asserts these types of breach of fiduciary duty claims, the Claimants assert that releasing those claims at this juncture would be wasteful since there may be substantial insurance proceeds available. When I raised my concern about releasing management from prepetition breaches of fiduciary claims, the proponents agreed to carve out those claims from section 37.6, except to the extent that they would otherwise be indemnified under the by-laws or applicable Delaware law. *See* Modification of Third Am. Joint Plan, ¶ 5 at 1. Given this concession, I find the scope of the release acceptable.

b. *The Propriety of the Injunction Provision*

Other asserted evidence of bad faith is the injunction provision embodied in section 37.9 which provides:

Except as provided herein, as of the Effective Date, all non-Debtor entities are permanently enjoined from commencing or continuing in any manner, any action or proceeding, whether directly, derivatively, on account of or respecting any claim, debt, right or cause of action of the Debtors or Reorganized Leslie Fay which the Debtors or Reorganized Leslie Fay, as the case may be, retain sole and exclusive authority to pursue in accordance with Section 26.1 [sic][26] of the Plan or which has been released by the Debtors or Reorga-

---

**24.** As to what types of claim this provision was intended to release, see Tr. 176, 177, 178–79; *see also* representation by counsel for the debtors, Tr. 603.

**25.** The relevant provisions of Leslie Fay's by-laws draw a distinction between actions by third parties and actions by or on behalf of the corporation. The by-laws mirror the permissible extent to which Delaware laws allows its corporations to indemnify officers and directors. *See* 8 DEL. CODE § 145(a) & (b).

Stated succinctly, the by-laws provide for full indemnification of the officers and directors for lawsuits by others if and only if the officer or director acted in good faith with the reasonable

belief that the action or inaction was not opposed to the best interests of the corporation. For indemnification against suits by or on behalf of the corporation, not only must. the officer or director have acted with good faith and with the reasonable belief he or she was acting in the best interests of the corporation, but that officer or director may not have been adjudged liable to the corporation for such actions or inactions. If the officer or director has been adjudged liable to the corporation, then the court that so determined may consider all the circumstances and hold that the corporation must nonetheless indemnify him or her if the equities of the situation so justify. *See* Ex. N at 17–18.

**26.** The section should be 27.1.

nized Leslie Fay in accordance with Section 37.6 of the Plan.

Third Am. Joint Plan, § 37.9 at 38.[27]

Ruby testified that the board of directors of Reorganized Leslie Fay would decide whether or not to continue the derivative action. This is problematic because of the particular terms of Leslie Fay's executive protection insurance policy. The policy excludes from coverage actions by the corporation against its officers and directors, *unless* that action is a derivative one brought without the solicitation, assistance, or participation of the officers, directors, or Leslie Fay itself.[28] Section 37.9 of the plan ignores this critical distinction in the policy. Here, it is factually undisputed that neither Leslie Fay nor its officers or directors solicited, assisted, or participated in the prosecution of the derivative action. Indeed, Ruby testified that Leslie Fay has never even considered suing its own officers and directors. Tr. 269. However, upon confirmation of the plan with section 37.9 as originally proposed, the power to decide whether or not to continue the derivative action is placed right into the hands of the corporation itself and thereby right into the "insured v. insured" exception to coverage contained in the executive protection policy. *See* Ex. F. As a result, the insurance proceeds would almost certainly be lost.

During the confirmation hearing, I indicated my reluctance to approve a plan of reorganization which would waste such a substantial potential asset. I suggested another mechanism for handling the decision of whether or not to proceed with the derivative action short of handing it over to the board of directors of Reorganized Leslie Fay and thereby risking the immediate loss of any available insurance proceeds. I suggested setting up a special subset of the creditors, who are not involved in the management of the reorganized companies, for the purpose of deciding whether or not, and, if need be, to prosecute the derivative action on behalf of the estate. The Claimants suggest that I instead refuse to confirm the plan and appoint a chapter 11 trustee. I see no need to proceed on that alternate and expensive route, given that I previously appointed an

---

27. 27.1 of the plan provides:

> Prosecution of Claims. From and after the Confirmation Date, Reorganized Leslie Fay shall, as a representative of the estates of the Debtors, litigate any avoidance or recovery actions ... and any other causes of action, rights to payment of claims that belong to the Debtors or Debtors in Possession, that may be pending on the Confirmation Date or instituted by the Debtors thereafter, to a Final Order, and Reorganized Leslie Fay may compromise and settle such claims, without approval of the Bankruptcy Court (but with approval of, or within parameters established by, the Board of Directors of Reorganized Leslie Fay). The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be remitted to the Disbursing Agent for inclusion in Cash Available for Distribution.

28. The primary insuring clauses provide:

> 1. The [Insurance] Company shall pay on behalf of each of the [Officers or Directors] all Loss for which the [Officer or Director] is not indemnified by [Leslie Fay] and which the [Officer or Director] becomes legally obligated to pay on account of any claim first made again him, individually or otherwise ... for a Wrongful Act committed, attempted, or allegedly committed or attempted by such [Officer or Director]....

2. The [Insurance] Company shall pay on behalf of [Leslie Fay] all Loss for which [Leslie Fay] grants indemnification to each [Officer of Director], as permitted or required by law, which the [Officer or Director] has become legally obligated to pay on account of any Claim first made against him, individually or otherwise ... for a Wrongful Act committed, attempted, or allegedly committed or attempted by such [Officer or Director]....

> \* \* \* \* \* \*

> Notwithstanding the foregoing, the [Insurance] Company shall not be liable for Loss on account of any Claim made against any [Officer or Director]:

> \* \* \* \* \* \*

> (c) brought or maintained by or on behalf of any [Officer or Director or Leslie Fay] except: (i) a Claim that is a derivative action brought or maintained on behalf of [Leslie Fay] by one or more persons who are not [Officers or Directors] and who bring and maintain the Claim without the solicitation, assistance or participation of any [Officer or Director or Leslie Fay],

> (iii) a Claim brought or maintained by an [Officer or Director] for contribution or indemnity, if the Claim directly results from another Claim covered under this section.

Ex. F (emphasis supplied).

examiner to investigate the knowledge of senior management and that I disbelieve Terwilliger.

■ As a result of my comments, the proponents changed the plan to provide that a "Derivative Action Board" consisting of three persons appointed by the bankruptcy court upon nomination of the creditors' committee shall determine by majority vote whether or not to prosecute, compromise, and settle or discontinue the derivative action. *See* Modification of Third Am. Plan, ¶¶ 1, 3 at 1. Provided this board does not consist of any members of Leslie Fay's board of directors, I find this amendment acceptable.

#### c. *The Class Action Settlement*

An additional issue raised by the Claimants regarding the use of the insurance proceeds arises from the fact that the executive protection policy provides coverage *both* for any indemnification of its directors and officers required of Leslie Fay under its by-laws, and for the individual Leslie Fay officers and directors for a liability judgment or fees and expenses incurred in defending such a suit, which they personally might incur or have asserted against them.[29] Notwithstanding the dual protections, there is but a single coverage limit which is applicable to the two types of coverage, so that payment under either reduces the amount of coverage remaining available under both.

In *In re Sacred Heart Hospital,* 182 B.R. 413, 420 (Bankr.E.D.Pa.1995), the court noted that "payment of either type of claim would have diminished the pot, and arguably exposed the debtor to [indemnification] claims which otherwise might have been paid by the insurer." Thus, such a shared interest in the insurance proceeds was sufficient to bring those proceeds into the estate, irrespective of whether those policies also provided liability coverage for the debtor's directors and officers. *In re Sacred Heart Hospital,* 182 B.R. at 419–20 (citing *In re Vitek, Inc.,* 51 F.3d 530, 534 n. 17 (5th Cir. 1995)).[30] Thus, the *Sacred Heart* court concluded, "the Debtor may, by means of its plan, regulate access to this property in relation to other estate assets." *Id.*

Here, the debtors have an interest in those proceeds because of the possibility that the class action might deplete the policy and theoretically force claims for indemnification to fall upon the estate. In addition, the debtors have an independent right to those proceeds by virtue of the executive protection policy's exception to the "insured v. insured" exception to coverage. Ex. F, ¶ 5(c)(i). Therefore, as long as there is a pending derivative action qualifying under the terms of the policy, Leslie Fay would have an interest in any insurance proceeds available as a result of its officers' or directors' wrongful acts.[31]

29. The Insurance Policy, however, does not cover losses "on account of any Claim made against any [Officer or Director]:
(a) for an accounting of profits made from the purchase or sale by such [Officer or Director] of securities of [Leslie Fay] within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any federal, state or local statutory law or common law;
(b) based upon, arising from, or in consequence of any deliberately fraudulent act or omission or any willful violation of any statute or regulation by such [Officer or Director], if a judgment or other final adjudication adverse to the [Officer or Director] establishes such a deliberately fraudulent act or omission or willful violation; or
(c) based upon, arising from, or in consequence of such [Officer or Director] having gained in fact any personal profit, remuneration or advantage to which such [Officer or Director] was not legally entitled.
Ex. F, ¶ 5(c).

30. There is a split of authority on whether this constitutes a property interest. Some courts have held that the proceeds are simply not property of the estate. *See, e.g., Louisiana World Expo. v. Federal Ins. Co. (In re Louisiana World Expo),* 832 F.2d 1391, 1398–99 (5th Cir.1987). For an analytical discussion on the inherent flaw in having a *per se* rule either way with respect to the characterization of insurance proceeds, see George Ong, Comment, *Directors and Officers Insurance Proceeds in Bankruptcy: The Impact on an Estate and Its Claimants,* 13 BANKR.DEV.J. 235 (Winter 1996).

31. Pursuant to the policy:
Wrongful act means any error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted, or allegedly committed or attempted by an Officer or Director, individually or otherwise in his capacity as Officer or Director, or any matter claimed against him solely by reason of his or her serving in such position.

Ruby testified that there are $50 million worth of proceeds available under the executive protection policy, Tr. 255, and the Claimants have submitted evidence that negotiations in the class action have resulted in a proposed settlement of the class action claims against the management defendants for roughly $26.5 million of the insurance proceeds, leaving a substantial potential asset for the estate. The Claimants ask that I appoint an independent trustee to interpose himself or herself into the class action and block the settlement, with a view toward commandeering the insurance proceeds for the benefit of the estate. However, I do not believe that under the circumstances of this case, such a result would be fair or equitable to the interested parties. One of my colleagues recently analyzed the conflicting law on this issue and held that, notwithstanding a debtor's interest in executive protection insurance policy proceeds, a court should undertake a section 105(a) analysis in deciding whether or not to enjoin the use of the proceeds. *Goldin v. Primavera Familienstiftung, TAG Assocs., Ltd. (In re Granite Partners, L.P.)*, 194 B.R. 318, 335–38 (Bankr. S.D.N.Y.1996) (Bernstein, J.); *see also* George Ong, Comment, *Directors and Officers Insurance Proceeds in Bankruptcy: The Impact on an Estate and Its Claimants*, 13 BANKR.DEV.J. 235 (Winter 1996).

In *Granite*, Judge Bernstein found insufficient for the issuance of an injunction the trustee's bald contention that the estate will suffer irreparable injury because the third party lawsuits would deplete estate assets and potentially prejudice settlement discussions. Here, as in *Granite*, the Claimants offer only conclusory and unsupported allegations of prejudice. The objecting creditors have not demonstrated that it would be unfair or inequitable to permit the settling defendants to rely on the insurance coverage to indemnify them when such an indemnification was expressly contemplated by Leslie Fay's by-laws. *See* Ex. N. Presumably, the insurance company would not be agreeing to pay out on those claims unless it believed that the insureds' actions or inactions fell within the ambit of coverage. *See supra* note 30. The settling individuals have timely filed indemnification claims against this estate; the Claimants have not pointed to any other pending or threatened action by which claims against the officers and directors might usurp the insurance proceeds and risk the estate's being liable for uncovered indemnification claims. Therefore, there is little, if any, danger that the class action settlement would so deplete the insurance proceeds that they would be insufficient to pay for indemnification claims against the estate. *Cf.* Ong, Comment, *Directors and Officers Insurance, supra,* at 267–68. This is so because (i) the only other outstanding claims against such proceeds are by the corporation itself, and (ii) confirmation appears imminent, at which time unasserted claims by officers and directors for indemnification will be discharged. Plainly then, the settlement poses no threat or bar to reorganization, which is the touchstone for issuance of an injunction under section 105 of the Bankruptcy Code. Moreover, the plan was negotiated and accepted by the creditors without reference to a distribution of any proceeds of insurance under the executive protection policy. It is also noteworthy that the class action was commenced approximately five months before the bankruptcy filing and more than three months before the discovery of the accounting irregularities. The derivative action was also commenced prebankruptcy. Accordingly, it cannot be said that the plaintiffs attempted to evade the automatic stay by suing the officers and directors postbankruptcy. The intended beneficiaries of the policy are both the individuals and the corporation, and not solely the corporation. On these facts, I do not believe the equities warrant granting the Claimants' request that I refuse to confirm the plan and enjoin the class action settlement.

Ex. F, ¶ 18 at 10. The insurance policy, however, does not cover losses on account of any claim made against an officer or director for an accounting of profits made from the purchase or sale of Leslie Fay securities, or for any claims based upon an officer's or director's deliberately fraudulent acts or omissions, any willful violations of any statute or regulation, or based upon or in consequence of such officer having gained in fact any personal profit, remuneration, or advantage to which such person was not legally entitled. Ex. F, ¶ 5(c); *see supra* note 28.

Based on the foregoing, the contention that the plan was proposed in bad faith is overruled. The related issues of feasibility and fairness to creditors will be discussed shortly.

### 2. Disclosures, § 1129(a)(5)

■ "Section 1129(a)(5) requires a host of disclosures and approvals with regard to the postconfirmation management of the revested debtor." 7 L. KING, COLLIER ON BANKRUPTCY, ¶ 1129.03[5] at 1129–39 (15th ed. rev. 1996). Here, the employment, compensation, and terms of all senior insiders to be employed by the debtors following confirmation have been disclosed; relevant employment agreements and related stock option and benefit plans were annexed to the disclosure statement and plan of reorganization.

The Claimants allege that current management ought not be permitted to continue in their positions postconfirmation. However, as I discussed above, the claimants have not submitted sufficient evidence to demonstrate current management's alleged wrongdoing. Accordingly, the continued service of a debtor's management is proper. *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141 (Bankr. S.D.N.Y.1984) (absent evidence that the continued service is inconsistent with the interests of creditors, equity security holders, or public policy, continued service is proper); *accord In re 203 North LaSalle St. L.P.*, 190 B.R. 567, 591 (Bankr.N.D.Ill.1995). Particularly since this plan was promulgated by the creditors' committee along with the debtors, the creditors' expressed preference for retaining senior management ought not be ignored.

### 3. Best Interests of Creditors, § 1129(a)(7)

■ The requirements of section 1129(a)(7) have come to be known colloquially (if technical jargon can ever be colloquial) as the best interests of creditors test.[32] The test requires that each holder of a claim or interest either accept the plan or receive or retain property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated in a hypothetical liquidation under chapter 7 of the Bankruptcy Code. *See In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 759 (Bankr.S.D.N.Y.1995); *In re Best Prods. Co., Inc.*, 168 B.R. at 72; *In re Victory Constr. Co., Inc.*, 42 B.R. 145, 151 (Bankr.C.D.Cal. 1984). Thus, under the best interests test, the court "must find that each [dissenting] creditor will receive or retain value that is not less than the amount he [or she] would receive if the debtor were liquidated." *In re Victory Constr. Co., Inc.*, 42 B.R. at 151. The "best interests" tests concerns individual creditors and equity holders rather than classes of claims or interests. *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. at 761. "It is an individual guaranty to each [objecting] creditor or interest holder that they will receive at least as much in reorganization as they would in liquidation." 7 L. KING, COLLIER ON BANKRUPTCY, ¶ 1129.03[7] at 1129–42 (15th ed. rev. 1996).

■ According to the testimony of Wishart and the affidavit submitted by Stephen S. Ledoux of Blackstone, the value of the combined estates is $265 million. On confirmation based upon the stock and notes to be received, the claimants in class 6 will receive approximately 79% of the value of their claims. Wishart testified that the proceeds available on liquidation to unsecured creditors will be $83 million, and further that there are approximately $327 million in unsecured claims. On liquidation, therefore, these creditors would receive some 25% of their claims. Accordingly, the best interests of the creditors are protected by confirmation of the plan. On liquidation, the statuto-

---

32. In relevant part, the section provides:
With respect to each impaired class of claims or interests—
(A) each holder of a claim or interest of such class—
(i) has accepted the plan; or
(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date....
11 U.S.C. § 1129(a)(7).

rily subordinated claims in class 8 will receive nothing. Similarly, equity interests will receive nothing on liquidation and nothing on confirmation. Given that there will be insufficient liquidation proceeds to satisfy even the unsubordinated unsecured claims, the fact that class 8 and the equity classes will receive nothing in a reorganization as well as nothing in a liquidation satisfies compliance with the best interests of creditors test.

The only pause is that in the middle of the confirmation hearing the Claimants orally raised for the first time the issue of whether the tax aspects of the plan were reasonable. The Claimants point out that Wishart relies exclusively on the Blackstone opinion and on the tax advice of his professionals in testifying that the assumptions regarding the tax aspects of the plan are reasonable. The Claimants also point to the substantial disclaimers contained within the disclosure statement regarding the tax aspects of the plan. However, nowhere in any of the Claimants' four submissions objecting to the plan[33] is there any hint that they planned to take issue with the propriety of the tax treatment of the transactions embodied in the plan. And the tax ramifications of this plan were fully described in the disclosure statement.

Had the plan proponents known that the Claimants were challenging the wisdom of the tax consequences caused by the plan, they could have had Blackstone, Arthur Anderson or the tax lawyers from Weil Gotshal or Wachtell Lipton testify as to the reasonableness of the plan. But the Claimants did not alert the plan proponents to this ground for objection in any of their written submissions. Whereas the Claimants questioned whether the risks inherent in the plan were reasonable they produced no evidence of their own to suggest that those fully disclosed risks were unreasonable because the IRS was likely to disapprove the tax strategy. Accordingly, I see no reason to question Wishart's testimony that the debtors properly relied on the tax advice of a bevy of professionals.

---

**33.** Claimants' Obj. to Plan (Jan. 7, 1997) (outlining the "grounds upon which objections are based"); Claimants' Mem. in Supp. of Obj. (Jan. 14, 1997); Claimants' Supp. Obj. to Plan and

Accordingly, I find that the plan meets the best interests of creditors test.

### 4. Acceptance by the Classes of Creditors and Interest Holders, § 1129(a)(8)

Section 1129(a)(8) of title 11 requires that with respect to each class of claims, either "(A) such class has accepted the plan; or (B) such class is not impaired under the plan." As to the creditors in classes 1 through 7, this subsection is met; all classes voted in favor of the plan. However, as to equity and the unliquidated, statutorily subordinated claims in class 8, the plan does not meet section 1129(a)(8)'s requirements because these classes, receiving no distribution, are deemed to vote against the plan. 11 U.S.C. § 1126(g).

Notwithstanding, section 1129(b) allows a plan proponent to "cram down" a plan over the dissenting class so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under and has not accepted the plan. However, before the proponent is permitted to cram down a plan, the proponent must show that all of the other requirements of section 1129(a), including feasibility, are met. I return, therefore, to the remaining requirements of section 1129(a).

### 5. Feasibility, § 1129(a)(11)

Section 1129(a)(11) requires the court to find that the confirmation of the plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor, unless such liquidation or reorganization is proposed in the plan. 11 U.S.C. § 1129(a)(11). The court must find that the plan is workable and has a reasonable likelihood of success. *See In re Woodmere Investors L.P.*, 178 B.R. 346, 361 (Bankr.S.D.N.Y. 1995); *In re 8315 Fourth Ave. Corp.*, 172 B.R. 725, 734 (Bankr.E.D.N.Y.1994). A leading treatise on the subject says:

Motion for an Independent Trustee (Feb. 13, 1997); and Claimants' Obj. to Supp.Discl.Statement (Mar. 14, 1997).

Basically, feasibility involves the question of the emergence of the reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success. It is not necessary that success be guaranteed, but only that the plan present a workable scheme of organization and operation from which there may be a reasonable expectation of success.

5 L. KING, COLLIER ON BANKRUPTCY, ¶ 1129.02 at 1129–61.11 (15th ed. 1996). To establish feasibility, the debtor must present proof through reasonable projections, which are not speculative, conjectural or unrealistic, that there will be sufficient cash flow to fund the plan and maintain operations. *Pan Am. Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 508 (S.D.N.Y.1994). The Second Circuit has stated that "the feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 649 (2d Cir.1988). Courts have observed the following factors that should be considered when the debtor is engaged in business:

(1) the adequacy of the capital structure;

(2) the earning power of the business;

(3) the economic conditions;

(4) the ability of management;

(5) the probability of the continuation of the same management;

(6) the availability of prospective credit, both capital and trade;

(7) the adequacy of funds for equipment replacements;

(8) the provisions for adequate working capital; and

(9) any other matter bearing on the successful operation of the business to enable performance with the provisions of the plan;

*See, e.g.,* 7 L. KING, COLLIER ON BANKRUPTCY, ¶ 1129.LH[2] at 1129–82 (15th ed. rev. 1996); *Resorts Int'l,* 145 B.R. at 479 (citing *In re Jartran, Inc.,* 44 B.R. 331, 393 (Bankr. N.D.Ill.1984)); *In re Landmark Plaza Park Ltd.,* 7 B.R. 653 (Bankr.D.N.J.1980).

 The debtors presented sufficient evidence for positive findings with respect to feasibility as more fully described in the factual portion of this decision. The overwhelming support of the creditors, garnered after their professionals reviewed the debtors' projections, lends credence to the debtors' belief in the feasibility of the plan. The debtors fully and fairly disclosed the risks associated with variances from projections, the lack of a trading market for the shares, the leveraged condition of New Sassco, the competitive conditions in the industry, and certain tax matters associated with the plan. "The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required." *In re Drexel Burnham Lambert Group Inc.,* 138 B.R. 723, 762 (Bankr. S.D.N.Y.1992); *Kane,* 843 F.2d at 649. Blackstone opined on the adequacy of the capital structure; the existence of sufficient exit financing has been proven; management of both reorganized entities is a known quantity; and Wishart testified that if the reorganized debtors meet their reasonable projections, they will be strongly postured to obtain long term financing within two to three years of their emergence from chapter 11. "Moreover the option program incentivizes management to increase the value of the [reorganized companies'] Common Stock beyond its worth at the effective date of the Plan. These provisions relating to management support feasibility." *In re Piece Goods Shops, L.P.,* 188 B.R. at 799. The apparent goal of this plan is to restructure the debtors' obligations in order to preserve the businesses and avoid liquidation, one consistent with the goals of the Bankruptcy Code. *See Id.* at 791.

Accordingly, I find the plan economically feasible.

## 6. Retiree Benefits, § 1129(a)(13)

Section 1129(a)(13) requires that:

The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

Section 1114 requires the debtor to comply with the provisions of the employee benefit plan that was in effect at the time the case was commenced. However, whereas retirees are protected by section 1114 from the termination of benefits due to the filing of a petition under the Bankruptcy Code, they are not protected from the termination of rights due to the expiration of the benefit plan. 7 L. KING, COLLIER ON BANKRUPTCY, ¶ 1114.03[1] at 1114–16 (15th ed. rev. 1996).

■■■ The disclosure statement reveals that the debtors intend to terminate the retirement plan and that the retirement plan is underfunded by approximately $900,000 which underfunding shall be paid from consummation cash pursuant to the plan. Further, the debtors believe that as a result of funding the deficiency, no future liability will arise. Discl. Statement for Am. Joint Plan, at 28. The plan provides that Reorganized Leslie Fay will continue to pay all retiree benefits at the level established in accordance with section 1114(e)(1)(B) or (g) for the duration of the period during which each debtor has obligated itself to provide such benefits. Third Am. Joint Plan, § 41.2 at 41. The debtors' response to Juan Kelly's objection to the plan based on its failure to adequately provide for retiree benefits assures that:

the Debtors and all members of their controlled group would be jointly and severally liable for any unfunded benefit liabilities of the Retirement Plan, to the extent allowed under 29 U.S.C. § 1362(a), and that any future liability that should arise under 29 U.S.C. § 1362 shall not be affected in any way by the Debtors' chapter 11 cases, including discharge. Thus, to the extent that the Debtors fail to fully fund the Retirement Plan, which the Debtors intend to do on the Effective Date, neither the Retirement Plan nor the Pension Benefit Guarantee Corporation will be precluded by confirmation of the Plan from commencing any action, or taking any other action, to collect, enforce, or recover from Reorganized Leslie Fay, its successors or

their assets or properties, any rights or claims under ERISA or otherwise.

Debtors' Respn. ¶ 15 at 8–9.

Based on the facts that the debtors are to fully fund the deficiency out of consummation cash and that they acknowledge that their liabilities for benefits are not discharged by confirmation, I find that the plan meets the requirement of section 1129(a)(13).[34]

### C. Cram Down Under Section 1129(b)

■■■ The most significant potential obstacle to confirmation of the Leslie Fay plan is the question of its compliance with the absolute priority rule as codified in the Bankruptcy Code. The rule provides that, in order for a plan to be approved in the face of the refusal of a creditor class to accept it, the holder of any claim or interest junior to that of the dissenting class may not "receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii).

The rule thus stated has three components: (1) the identification of junior claims or interests; (2) the identification of any property retained by the holders of such claims or interests; and (3) the determination whether the property is being retained "on account of" a junior claim or interest.

In re Wabash Valley Power Assoc., Inc., 72 F.3d 1305, 1312 (7th Cir.1995), cert. denied, —— U.S. ——, 117 S.Ct. 389, 136 L.Ed.2d 305 (1996). The term "interest" in this context means equity interest and includes options to purchase stock. See 7 L. KING, COLLIER ON BANKRUPTCY, ¶ 1129.04[4][a][A] at 1129–84 (15th ed. rev. 1996); In re Homestead Partners, Ltd., 197 B.R. 706, 712 (Bankr.N.D.Ga.1996).

In the same vein, equity's objection to confirmation requires the same analysis, for if management is receiving their stock options "on account of" their prior interest, the plan would also unfairly discriminate against equity, thus violating section 1123(a)(4).[35]

**34.** Included among the findings in the order of confirmation is to be one consistent with the debtors' representation regarding the retiree benefits.

**35.** In relevant part, the provision provides:

The interests granted to management pursuant to the plan are contained within stock option agreements. Those interests will be granted on the effective date of the plan. As more fully described above, on the effective date, New Sassco management will receive an option to purchase 10% of the New Sassco common stock, 25% of which will immediately vest; the remainder will vest simply upon the expiration of time, or earlier, upon the death, disability, termination without cause, or resignation for good reason of the management participant.[36] New Sassco's nonvested options expire if management is terminated for cause. New Sassco management will also receive options if certain earnings targets are achieved. Also on the effective date, Reorganized Leslie Fay management will receive options to purchase 5% of the Reorganized Leslie Fay common stock. These options will vest on each of the first, second, and third anniversaries of the effective date, or earlier if there is a change of control. However, if a management participant departs, he or she will be entitled to exercise only those options exercisable upon the date of termination. In other words, unlike with Sassco, a Reorganized Leslie Fay management optionee will have to remain with the reorganized debtor for at least one year to be entitled to exercise any option granted on the effective date of the plan.

Reorganized Leslie Fay's management option rights are subject to divestment if management is terminated for cause. The other Reorganized Leslie Fay management options (the additional 5 to 12½%) are contingent upon earnings targets contained in the plan.

Other than members of management, no other current equity holders or claimants in class 8 will receive or retain any property under the plan, nor an interest in the new companies or any option to purchase such an interest. Therefore, the receipt of stock options is subject to scrutiny to determine whether there is unfair discrimination and whether the plan is fair and equitable. 11 U.S.C. § 1123(a)(4); 11 U.S.C. § 1129(b)(2)(B) & (C).[37]

The proponents urge that this is much ado about nothing because management is not receiving the options "on account of" their prepetition equity interests; instead they are receiving arms-length bargained for consideration to ensure their needed cooperation in the reorganization effort. They argue, that, unlike what the objecting shareholders contend, management is not participating in a stock swap and thereby receiving new equity in the reorganized companies.

Management contracts are a permissible way to effectuate a corporate reorganization.

Notwithstanding any otherwise applicable non-bankruptcy law, a plan shall—...
 (4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.
11 U.S.C. § 1123(a)(4).

36. Whereas the debtors' responsive papers in support of confirmation argue that management, "however, [is] receiving stock options which vest only upon such entities attaining certain earnings targets set forth in the plan," Debtors' Respn. ¶ 34 at 21 (Feb. 17, 1997), an examination of the option contracts belies this assertion.

37. Whereas the stock options are subject to scrutiny under the fair and equitable test of section 1123(a)(4), the fact that equity and class 8 are to be eliminated does not otherwise raise the spectre of discrimination under section 1129(b)(1). The Code does not prohibit all types of discrimination between classes, only discrimination that is unfair. See 11 U.S.C. § 1129(b)(1); 7 L. King, Collier on Bankruptcy, ¶ 1129.04[3][a] at 1129–69

(15th ed. rev. 1996). The section 1129(b)(1) test boils down to whether the proposed discrimination between classes has a reasonable basis and is necessary for the reorganization. Collier on Bankruptcy, supra.

 As to the equity interests, the elimination is a necessary by-product of compliance with the absolute priority rule embodied in section 1129(b)(2). Equity is not permitted to receive or retain any interest until nonconsenting senior classes receive payment in full. See Case v. Los Angeles Lumber Co., 308 U.S. 106, 117, 60 S.Ct. 1, 8, 84 L.Ed. 110 (1939) ("the stockholder's interest in the property is subordinate to the rights of creditors...."). Because class 8 is deemed to vote against the plan and these debtors are insolvent, equity must be extinguished, and the plan therefore meets the requirement that the plan not "unfairly discriminate" under section 1129(b)(1) as to the equity classes. Likewise, the subordinated claims in class 8 are properly being extinguished under the plan because the reorganization value of the company is $265 million, clearly less than the $327 million in unsecured claims estimated as allowed against the estate.

*See generally In re Gibson & Cushman Dredging Corp.,* 103 B.R. 399 (Bankr. E.D.N.Y.1989); *In re Food City, Inc.,* 94 B.R. 91 (Bankr.W.D.Tex.1988); *see also Horowitz v. Kaplan (In re Waltham Watch Co.),* 193 F.2d 64, 74 (1st Cir.1951) (Act case), *cert. denied,* 342 U.S. 946, 72 S.Ct. 561, 96 L.Ed. 704 (1952) (quoting *Swanson v. Barclay Park Corp. (In re Barclay Park Corp.),* 90 F.2d 595, 598 (2d Cir.1937))[38]. They are expressly contemplated in the Code. 11 U.S.C. § 1129(a)(5)(B). There is a need to have the person continue the business where, without such person, what may be passed along for "restructuring" is merely a corporate shell. Chapter 11 assists in providing a mechanism to encourage that person not to run off and pursue personal endeavors when his or her presence will bring the greatest return to creditors. What is essential to rehabilitation is the ability to start afresh with a new balance sheet and a realistic prospect of success. A strong management, the confidence of creditors, and a promising business endeavor are the end products of a successful reorganization.

■ It is plain from the plan supplement containing the stock option provisions that the management of Reorganized Leslie Fay will not be entitled to exercise any options granted on the effective date of the plan unless they remain with Reorganized Leslie Fay through at least the first plan anniversary. Accordingly, it cannot be said that the options are founded on the mere promise of future services such that their grant to former shareholders might run afoul of *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), which prohibits the granting of equity to former equity holders on the promise of future services where a creditor class which is not paid in full rejects the plan. In other words, as

the plan proponents argue, the stock option provisions relevant to Reorganized Leslie Fay constitute an incentive to management to continue working for a reasonable period of time and do not constitute a prohibited stock swap.

There can be no absolute priority problem with the New Sassco grant of stock options on the effective date for the simple reason that there is nothing in the record showing that those managers are former shareholders.

## C. *Management's Fiduciary Obligations Regarding the Stock Options*

■ There remains, however, the question of whether the grant of the options can be said to run afoul of management's fiduciary obligations. *See* Martin J. Bienenstock, *Conflicts Between Management and the Debtor in Possession's Fiduciary Duties,* 736 PLI/Comm 555, 563 n. 12 (April/May 1996); Lynn M. LoPucki & William C. Whitford, *Bargaining over Equity's Share in the Bankruptcy Reorganization of Large, Publicly Held Companies,* 139 U.Pa.L.Rev. 125, 150–51 (Nov. 1990)." The provisions for management, including the employment agreements, were negotiated over many months with the creditors' committee. The contracts and the stock option incentives appear to serve the interests of the creditors who will own the emerging corporations. The salary and bonus provisions are in the same ballpark as the prepetition compensation. And the stock option prices equal the value of the shares at approximately the effective date of the plan, suggesting that the purpose of their grant is to incentivize management to increase the value of the shares for the benefit of the new shareholders, i.e., the creditors. Accordingly, I conclude that there is no inherent unfair discrimination,

---

**38.** Whereas the Second Circuit's decision *In re Barclay Park Corp.* predated the Supreme Court's decision in *Case v. Los Angeles Lumber Prods. Co.,* 308 U.S. 106, 120–21, 60 S.Ct. 1, 9–10, 84 L.Ed. 110 (1939) (holding that even when an old stockholder has "financial standing and influence in the community" and can provide "continuity of management," this constitutes no legal justification for issuance of new stock to him or her), a First Circuit case decided subsequent to *Los Angeles Lumber* cited *In re Barclay Park Corp.*

with approval and noted that *Los Angeles Lumber* itself had cited *In re Barclay Park Corp.* in a footnote at 308 U.S. at 123 n. 16, 60 S.Ct. at 11 n. 16. *See Horowitz v. Kaplan (In re Waltham Watch Co.),* 193 F.2d 64, 74 (1st Cir.1952) (Act case). And the Supreme Court's decision in *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), did not extend, limit or alter the *Los Angeles Lumber* case.

inequity, or breach of duty to either the old equity holders or the creditors.

Accordingly, with the revisions agreed to by the plan proponents during the confirmation hearing, the plan may be confirmed.

**SETTLE ORDER** consistent with this decision.